952 So.2d 982 (2006)
Nancy ELLIS, Appellant,
v.
John ELLIS, Appellee.
Nancy Ellis, Appellant,
v.
John ELLIS, Appellee.
Nos. 2005-CA-01741-COA, 2001-CA-00713-COA.
Court of Appeals of Mississippi.
November 7, 2006.
Rehearing Denied March 27, 2007.
*985 John Taylor Moses, John H. Freeland, T. Swayze Alford, attorneys for appellant.
Will R. Ford, New Albany, attorney for appellee.
Before KING, C.J., CHANDLER and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. This Court, as well as several chancellors, are familiar with the facts of the saga that is Ellis v. Ellis. See, Ellis v. Ellis, 840 So.2d 806 (Miss.Ct.App.2003). After seven years, three hearings, various orders, an appeal, and finally a change in custody, this Court now hears the second appeal of Ellis v. Ellis. During the parties' most recent trial concerning contempt and modification, there was emotional testimony from John and Dr. Nancy Ellis, their child, three experts, and others concerned with the child's well being. After a one day of trial concerning modification, the chancellor hearing the case gave his ruling from the bench and awarded John custody of the parties' child, thus modifying custody from the original decree. The lower court further ordered visitation for Nancy, child support for John, and awarded John attorney fees. Nancy now appeals and raises the issues of whether there was a material change in circumstances and whether the change in custody was in the child's best interest. Finding no error, we affirm the lower court's ruling.

PROCEDURAL HISTORY
¶ 2. John and Nancy were granted a divorce on the ground of irreconcilable differences on October 21, 1998. The judgment of the Chancery Court of Union County granted the parties joint legal custody of their minor child, Jennie Katherine Ellis, and Nancy was granted physical custody of Jennie Katherine with liberal visitation privileges granted to John. On October 25, 1999, barely a year after the parties' divorce, Nancy filed the first of many complaints for contempt. She argued that John had failed to pay certain bills and requested John's visitation rights be restricted. John countered that Nancy interfered with his visitation with Jennie Katherine and asked the court to allow him make up these missed days. John further requested the court grant him permanent physical custody of Jennie Katherine. Additionally, in anticipation of further visitation complications, John obtained a writ of assistance on October 26, 1999, to secure his visitation with Jennie Katherine.
¶ 3. The Chancery Court of Union County, chancellor John Ross speaking for the court, issued its decision on April 3, 2001. Chancellor Ross found that John was not in contempt for failing to pay certain medical bills, but that he failed to present any evidence showing a material change in circumstances that adversely affected Jennie Katherine so as to warrant a change of custody. The court then focused on the real issue before it, namely whether or not either party was in contempt regarding previously ordered visitation.
*986 ¶ 4. In determining whether Nancy was in contempt, the Chancellor reviewed several facts in his opinion that are almost identical to those facts presented in John's most recent modification attempt. The court noted Nancy "failed to provide the child for weekend visitation which on more that one occasion was witnessed by others as an intentional act." Nancy also hindered John's visitation by not transporting Jennie Katherine to the location specified in the court's decree, contacting the child to the extent where it interfered with John's time with her, and knowingly engaging the child in activities which would conflict with John's visitation. Chancellor Ross also commented on the difference in Jennie Katherine's attitude toward her father inside the presence of her mother as compared to outside her presence. Specifically, Chancellor Ross stated, "Disturbing evidence has been presented, that, on occasion, [Nancy] would speak to the child during [John's] visitation, either on the phone or directly, and immediately after these conversations, the child would start crying, and as a result, diminish the opportunity of [John] to enjoy visitation with his child." At the conclusion of a review of those facts, the chancellor found Nancy to be in contempt of court for failure to comply with the court's grant of visitation to John, and stipulated certain days of extra visitation for John to make up for those he lost. The court continued its opinion by speaking to the fact that, despite the joint legal custody the parties enjoyed, Nancy had removed Jennie Katherine from a private school system to be home schooled without any mention to John. Specifically, the lower court stated, "Nancy Ellis has not, at any time, allowed John Ellis any input in the health, education and welfare decisions of the minor child, nor has she conferred with him in the exercise in decision-making right, responsibilities and authority." Additionally, Dr. Joe Ed Morris testified that Jennie Katherine suffered from parental alienation syndrome as evidenced by the disregard Jennie Katherine shows towards her father while in the presence of Nancy and family drawings made by Jennie Katherine excluding John, identified by Dr. Morris as a classic sign of the syndrome.
¶ 5. Nancy claimed that she failed to abide by the court's decree because of the stress and trauma Jennie Katherine experienced as a result of visits with John. Nancy stated Jennie Katherine would beg her not to go and would cry herself to sleep the nights before she was to visit John. Nancy further asserted she was justified in refusing to allow John visitation because of various uncomfortable situations the child claimed she endured when with her father. These included being forced to sleep in the same bed, leaving the door open while she was taking a bath, and using the bathroom while she was taking a bath. John sufficiently explained these events and added that he did make her leave the bathroom door open while she was taking a bath because of the room's lack of ventilation and the possibility that he may need to retrieve various items.
¶ 6. Nancy was again ordered to confer with John on decisions concerning Jennie Katherine's health, education, and welfare. Nancy was further ordered not to schedule any events or cause any events to be scheduled that would interfere with John's visitation. Lastly, she was also ordered not to have any contact with Jennie Katherine during John's visitation periods unless absolutely necessary. The decision of the chancery court was appealed by Nancy on April 3, 2001. This Court affirmed the lower court's order in total save for a minor issue involving the calculation of John's make-up visitation. Ellis, 840 So.2d at (¶¶ 33-37).
*987 ¶ 7. In February of 2002, Nancy filed her second petition of contempt claiming that John owed her monies under the original divorce decree. In a familiar turn, John filed his counter-claim for contempt and custody modification. After a hearing on the matter, Special Chancellor Jason H. Floyd issued his judgment on October 10, 2003. After dispensing of the relatively minor property disputes between the parties, Chancellor Floyd moved to the issues of Nancy's possible contempt of the court's visitation orders and custody modification.
¶ 8. As to visitation, in finding that Nancy was not in contempt, the lower court stated that Nancy had complied with the ordered visitation with one exception, which was attempted to be remedied. Furthermore, the court found that Jennie Katherine appeared to be happy and comfortable during her visits with John during this time period. However, the court did comment on Nancy's lack of encouragement toward a healthy relationship between John and Jennie Katherine. Specifically, while Chancellor Floyd did not label Nancy's actions "parental alienation," he did admonish Nancy for her failure to encourage a good father-daughter relationship.
¶ 9. Speaking to custody modification, the chancellor found that no material change in circumstances had occurred, and that Jennie Katherine's visitation with her father had actually improved and was more pleasant. The court then noted the testimony of Dr. Louis Masur and Dr. Joe Ed Morris. Each testified that the problems surrounding John and Jennie Katherine's relationship were primarily caused by Nancy, but both further stated that a change in custody would be very traumatic on Jennie Katherine and difficult for her to accept. Therefore, the court declined to change custody. Lastly, the court modified the parties' visitation schedule to reflect the fact that Nancy moved to Tulsa, Oklahoma. The changes to visitation were as follows:
For the 2003-2004 school year, Mr. Ellis is granted Thanksgiving and Spring Break vacations. The child is to be placed on an airplane bound for her father the day after the vacation starts, and the father is to place the child on a return flight the day before the school reconvenes.
For the 2004-2005 school year, Mr. Ellis is granted Christmas vacation. The child is to be placed on the airplane one day after the Christmas vacation starts, and Mr. Ellis is to return the child the day before the Christmas vacation ends.
These visitations will alternate from year to year.
Each summer Mr. Ellis is granted visitation from one week after school has concluded for the year until one week before school starts the next year.
. . . .
Each parent is allowed one phone call per week to Jennie Katherine while she is in the other parent's care, in addition, a phone call is allowed on each of the following days: Easter, Fourth of July, Thanksgiving, Christmas, and Jennie Katherine's birthday. This call will be between 6:00 p.m. and 8:00 p.m. each Sunday unless otherwise agreed to by the parties.
¶ 10. After Nancy failed to deliver Jennie Katherine for John's 2004 summer visitation, he filed a petition for emergency relief, contempt and modification on June 28, 2004, with the Chancery Court of Union County, to which Nancy eventually filed her counter-claim for modification of visitation on August 19, 2004. Chancellor Talmadge D. Littlejohn, the third chancellor to hear the woes of the Ellis family, held a bifurcated hearing on the issues of *988 contempt and modification. After a January 2005 trial limited to the issue of contempt, Chancellor Littlejohn found Nancy to be in contempt but stayed his decision on the proper remedy until the modification trial was concluded. The trial was held in June of 2005. The resulting fifty-two page ruling of the chancellor was thorough and evinced the lower court's caution in granting John's motion for a change in custody. Nancy now timely appeals.

FACTS
¶ 11. In accordance with Chancellor Floyd's judgment, Nancy was to deliver Jennie Katherine to John no later than one week after school ended for the summer. She failed to do this, which sparked John's petition for emergency relief mentioned above. After a series of events, an agreed order was filed on August 23, 2004. That order stipulated that John was to have immediate "make up" visitation with Jennie Katherine from the day of the order to October 23, 2004, after which she was to be returned to the custody of Nancy. During Jennie Katherine's stay with her father she was to attend New Albany schools. Additionally, during this period of "make up" visitation, both Nancy and John were to arrange counseling for Jennie Katherine.
¶ 12. Several events took place subsequent to the October 2003 judgment of Chancellor Floyd, each of which was testified to during the June 2005 trial, and considered by Chancellor Littlejohn in his ruling. The first noteworthy event occurred in March 2004. Nancy testified that she consulted with an attorney in Tulsa, Oklahoma, a Mr. Jonathan Sutton, concerning Jennie Katherine. The timing of this meeting was in question as upon cross-examination she admitted that the check she used to pay Mr. Sutton was dated May 26, 2004, but she explained that she met with him in March and did not pay until payment was requested in May. Notwithstanding the timing of Nancy's payment, she testified that Mr. Sutton told her he would file the necessary pleadings in Tulsa to remove the case from Mississippi courts and instructed her not to talk to John or deliver Jennie Katherine to him for the upcoming summer.
¶ 13. After Jennie Katherine returned from a trip to the Smoky Mountains with John during spring break of 2004, Nancy heeded Mr. Sutton's professional, albeit faulty, advice. From April 2004 to August 2004, John made a total of 142 telephone calls to Nancy and Jennie Katherine with only one (1) connect. Additionally, as noted above, Nancy failed to deliver Jennie Katherine to John for their ordered summer visitation. Instead, during the summer Nancy and Jennie Katherine visited Destin, Florida, Washington, D.C., and Oxford, Mississippi. This ultimately resulted in the parties returning to court, and the August 2004 agreed order.
¶ 14. During John's period of make up visitation from August to October 2004, Nancy sneaked in a cell phone to Jennie Katherine in a laundry bag, and while Nancy testified she never called or sent text messages to Jennie Katherine, testimony showed that Jennie Katherine called and sent several messages to Nancy during John's make-up visitation. Also, prior to John's 2005 summer visitation, Nancy, again, planned various events for Jennie Katherine to participate in during the summer, one of which she prepaid the required deposit, and at the conclusion of their trial Chancellor Littlejohn found these actions to be nothing more than an effort to embarrass John. Additionally, there was testimony detailing a school recital Jennie Katherine was involved in during May 2005. Testimony indicated that John and his mother drove from New Albany *989 to Tulsa to see Jennie Katherine perform. When they arrived at the entrance to the gated community in which Nancy and Jennie Katherine lived, John and his mother initially had trouble contacting Nancy to open the gate, despite both Nancy and Jennie Katherine being at home, but eventually made it through using other means. After pulling in front of Nancy's home approximately two hours before the recital was to begin, they were not invited inside and despite the fact that her grandmother and father were in a car outside of her house, Jennie Katherine did not even come to the door to wave. Nancy explained the reason for this inaction was that Jennie Katherine was getting ready for the recital. After arriving at the school, but before the event began, John was able to speak to Jennie Katherine for a few minutes. He asked Nancy if he could spend some time with Jennie Katherine after the recital, to which she responded that Jennie Katherine had homework. There were at least two other school events John claims he was not informed of. Following these events, the June 2005 modification hearing was held before Chancellor Littlejohn.

STANDARD OF REVIEW
¶ 15. In child custody modification cases, unless the chancellor was manifestly wrong, clearly erroneous, abused his discretion, or applied an erroneous legal standard, we must uphold his decision. Barnett v. Oathout, 883 So.2d 563(¶ 6) (Miss.2004). The chancellor has the responsibility to evaluate the credibility of witnesses and evidence and we, as the reviewing court, "will not arbitrarily substitute our judgment for that of the chancellor who is in the best position to evaluate all factors relating to the best interests of the child." Id. Additionally, findings of fact made by the chancellor may only be disturbed if they are not supported by substantial, credible evidence. Johnson v. Gray, 859 So.2d 1006(¶ 32) (Miss.2003).

DISCUSSION
I. HOW COULD THERE BE A MATERIAL CHANGE IN CIRCUMSTANCES WHEN EVEN JOHN ELLIS CONCEDED THAT NOTHING HAD CHANGED SINCE THE LAST CUSTODY HEARING?
¶ 16. Nancy's first point of argument is that there was no material change in circumstances warranting a change in custody. Additionally, she states that John admitted there was no change in circumstances when questioned by the lower court. Speaking to John's apparent admission of a lack of any material change, it is true that John stated, "No, sir" when asked by Chancellor Littlejohn if he could tell him anymore as to why custody should be changed. However, the chancellor's question was not simply, "what material change in circumstances has there been since the last custody hearing," but "can you add anything to the two days of testimony the court has heard." It is clear that John did not admit to a lack of a material change in circumstances, but that he could not add additional information to the testimony already given at trial, including his own, to aid the lower court in its determination.
¶ 17. As is well established in this state, in order to succeed in an attempt to modify custody, the non-custodial parent must show: (1) a material change in circumstances has occurred since the issuance of the judgment or decree sought to be modified, (2) the change adversely affects the welfare of the child, and (3) the proposed change in custody would be in the best interests of the child. Lambert v. Lambert, 872 So.2d 679(¶ 18) (Miss.Ct.App. *990 2003). In making this determination, the totality of circumstances must be considered. Ash v. Ash, 622 So.2d 1264, 1266 (Miss.1993). Nancy argues that nothing changed since the last custody hearing, but that John's arguments in the most current custody hearing were virtually identical to those hearings in the past. However, Chancellor Littlejohn opined that since the most recent order at the time of his ruling, the material change in circumstances that occurred was Nancy's continued violation of court orders pertaining to visitation and continued hindering of the visitation time John did enjoy as well as the father/daughter relationship, shown by the facts that Nancy smuggled a cell phone into John home for Jennie Katherine's secret use and Nancy's continued scheduling of various events for Jennie Katherine to participate in during John's visitation.
¶ 18. Notwithstanding the chancery court's findings, visitation, or interference thereof, should generally not be considered by the lower court while hearing the plea of a non-custodial parent to modify custody as "[t]he better rule would be for a chancellor to enforce contempt orders through incarceration . . . rather than resorting to a change of custody," but in some extraordinary cases the interference with a non-custodial parent's visitation rises to the level where it constitutes a material change in circumstances. Ash, 622 So.2d at 1266; see also Barnett, 883 So.2d at (¶¶ 2-5) (affirming a finding of a material change in circumstances as a result of a foster mother's interference with visitation and telephone contact of the natural father). In Ash, the parties were granted a divorce on the ground of irreconcilable differences and physical custody of the parties' one-year-old child was granted to the mother, with liberal visitation granted to the father. Id. at 1264-65. After a series of visitation-related restraining orders, emergency orders, and modification orders spanning five years, the non-custodial parent filed another motion to change custody and find the custodial parent in contempt. Id. at 1265. After a hearing, the chancellor permanently changed custody and placed the parties' child with the father, and the mother appealed. Id. In affirming the lower court's ruling, the supreme court cautioned against taking such drastic actions as changing custody to resolve visitation disputes, stating the case should not establish precedent, but agreed that under the facts presented to the lower court in which "two prior chancellors and six attorneys, [and] more than ten court proceedings, tackled and could not settle," the lower court's finding that the issues of visitation surrounding the parties and their child constituted a material change in circumstances was appropriate. Id. at 1266. While the supreme court did not wish to create precedent in Ash for the proposition that general interference with a non-custodial parent's visitation rights can constitute a material change in circumstances, as we do not wish to do with this opinion, Ash shows that there comes a time when the severity of interference with a non-custodial parent's visitation rights rises to a level that justifies a finding of a material change in circumstances. Coupled with an adverse affect on the child and a determination of the best interests of the child, a change in custody may be warranted.
¶ 19. Nancy cites Touchstone v. Touchstone, 682 So.2d 374 (Miss.1996), for the proposition that the facts of the case sub judice do not rise to the level of those present in Ash so as to warrant a change in custody. In Touchstone, the father, in his request for custody modification, asserted that the mother was violent towards him during "visitation swaps" and attempted to brainwash their child into thinking the father had molested him. Touchstone, 682 So.2d at 376. After the lower court *991 denied Dr. Touchstone's request for modification, he appealed to the supreme court and cited Ash in support of his assertion that the mother's interference with his visitation warranted a change in custody. Id. at 378. After noting the procedural differences between the two cases, this being the first custody modification hearing involving the Touchstones, the supreme court further distinguished Ash as there was "no evidence in the record before [the supreme court] that [the mother] refused to allow Dr. Touchstone to see his child or that any court orders had been violated." Id.
¶ 20. The facts before us are similarly distinguishable. While the procedural history of Ellis v. Ellis is not as robust as was the case in Ash, the amount of court time is still alarming. Since the divorce John has been forced to obtain a writ of assistance to secure visitation, subject himself and Jennie Katherine to three custody modification hearings with three different chancellors, an appeal to this Court, and an emergency order granting him visitation following the summer of 2004. This is far cry from the Touchstone's first custody hearing. Additionally, as further distinguished form Touchstone, there is ample evidence that Nancy has intentionally refused to let John see Jennie Katherine and that she has violated several court orders.
¶ 21. Nancy also relies on Lipsey v. Lipsey, 755 So.2d 564 (Miss.Ct.App.2000), for support of her argument that there was no material change in circumstances. As was the case with Touchstone, the facts of Lipsey are distinguishable. In Lipsey, the testimonies of both parents at the modification hearing amounted to nothing more than "mud-slinging." Lipsey, 755 So.2d at (¶ 11). In reversing the lower court's grant of modification, this Court noted that the lower court's decision was based on nothing more than "the parties' inability to cooperate with one another." Id. at (¶ 7). Additionally, the minor child appeared healthy and happy while with either parent, and suffered no adverse impact as a result of the parents' difficulties. Id. at (¶ 11).
¶ 22. Again, the facts before us paint a different picture. Chancellor Littlejohn's decision was based on Nancy's continued violation of court orders regarding visitation and continued alienation of Jennie Katherine from John. More importantly, the lower court's ruling was also based on the adverse effect Nancy's actions were having on the emotional well-being of Jennie Katherine, which was discussed in detail by three expert witnesses during the course of the trial.
¶ 23. Dr. Marilyn Snow was the first expert to testify. Dr. Snow began seeing Jennie Katherine in September of 2004 at the Oxford Play Therapy Training Center (OPTTC), and saw her personally three times while other counselors at the OPTTC saw her twice. During the first meeting between Dr. Snow and Jennie Katherine, Jennie Katherine stressed that she did not want to be with her father and wanted to go home. Dr. Snow stated that Jennie Katherine felt like John was only interested in himself and was not concerned about her feelings. Jennie Katherine, according to Dr. Snow, went on to detail incidents that made her feel uncomfortable during visitation such as her dad, after asking him not to, getting in bed with her, coming in the bathroom when she was bathing, and utilizing the bathroom while she was bathing. John explained these events during the parties first modification hearing. He stated that he and Jennie Katherine stayed with his sister on one occasion and slept in the same bed because there were no other available places to sleep. Also, during the first trial John testified that he did ask that Jennie Katherine *992 leave the bathroom door open, but only because of a lack of ventilation in the bathroom. He stated in this most recent modification trial that he has since ceased such requests out of respect for Jennie Katherine's privacy. Dr. Snow continued that Jennie Katherine was very clear that she did not want to talk to or visit her father and added that based on Jennie Katherine's maturity and intelligence she was fully capable of making those decisions and understanding there effects. She further testified that, in her opinion, Jennie Katherine's feelings of anger and depression surrounding her relationship with her father were genuine. She believed that there is alienation between Jennie Katherine and her father but stated that the alienation was caused by John's behavior. The lower court noted that Dr. Snow's conclusion of the origins of Jennie Katherine's parental alienation syndrome was doubted as she never conducted an interview with Nancy and only spoke with John briefly. Specifically, when asked what role she thought Nancy may have had in the damaged relationship between John and Jennie Katherine, she responded that she did not have any information on that. Her final recommendation to the court was to place Jennie Katherine with her mother and try to rebuild the relationship with her father while she was in a place where she felt comfortable.
¶ 24. Dr. Joe Ed Morris was the next expert called to the stand. He saw Jennie Katherine on five occasions from 1999 to 2004 and administered several psychological tests to her. As a result of Dr. Morris's history with Jennie Katherine and the various tests he performed, Chancellor Littlejohn gave more weight to his testimony over that of the other two experts. Dr. Morris was clear that the current environment she was in was not in her best interests. He further testified that Jennie Katherine suffered from mild to moderate depression throughout the years in which he was treating her. He believed that she had been systematically programmed to reject her father and the source of that programming was Nancy, and, as he did during the Ellis's earlier custody modification trial, stated that Jennie Katherine suffered from parental alienation syndrome and Nancy was the major cause of the alienation. As defined by Dr. Morris, parental alienation syndrome is a systematic programmed alienation of a child from one parent brought upon by the other parent. When asked if the almost constant amount of calls and messages sent by Jennie Katherine to Nancy using the phone she sneaked into Jennie Katherine was beneficial, he stated that it showed an excessive dependancy on the part of the mother to the child. It was his opinion that as a result of this parental alienation syndrome, Jennie Katherine has suffered an adverse affect in the form of depression throughout the Ellis's ordeal as well as a significant dip in social skills since the last time the family was in court. Dr. Morris further stated that Jennie Katherine's reservations with John went past parental alienation syndrome, but also included grandparents, aunts, and uncles on John's side of the family. Therefore, he concluded that the issues involved went past custody and concerned Jennie Katherine's overall emotional health. As to why Jennie Katherine felt this way about her father, unlike Dr. Snow, Dr. Morris stated that she gave no reasons for her feelings towards John. Furthermore, Dr. Morris testified that even those instances Dr. Snow spoke of regarding instances when John may have invaded Jennie Katherine's privacy, would not justify the level of emotional disregard Jennie Katherine exhibits towards her father. His final recommendation to the lower court was that the current environment of Jennie Katherine *993 should be changed and it was not in her best interests as a result of the parental alienation syndrome, and the adverse emotional affect Jennie Katherine has suffered because of it.
¶ 25. The final expert to testify was Dr. Louis Masur. Dr. Masur saw her a total of six or seven times from 2002 to 2004. He testified that Jennie Katherine seemed to be interested in only one relationship, that being with her mother. He believed, based on statements from Jennie Katherine, that Nancy and Jennie Katherine have a type of symbiotic relationship. As a result, it was his belief that nothing would happen in terms of visitation with John unless he had complete and absolute control over it. Dr. Masur continued that Jennie Katherine seemed to have too much control over what happens regarding visitation and that she felt like the courts had no authority over her. Furthermore, it was his opinion that Jennie Katherine appeared to be emotional about visitation with her father in a shallow and superficial way, and gave no reason for feeling this way save for the complaint that she would not be brought back. Dr. Masur stated that he thought it was not in the best interests of Jennie Katherine to remain in the situation she is in now, and that the long custody battle she has been a part of has arrested her development to a certain extent, and he advised the court to end the battle as soon as possible. Dr. Masur explained that he did not want Jennie Katherine wrested from Nancy's custody, but at the same time wanted John to have unfettered and uncontrolled access to Jennie Katherine, and if the court believed, as he did, that the current situation was not in Jennie Katherine's best interests, there may be no other options than a change in custody. He further testified that while she may be fourteen years old, her emotional development was not that of an average fourteen year old child, but somewhat lower. Additionally, when referring to Jennie Katherine's feeling about her father Dr. Masur stated, "I think they are real and I think they are intense. I think also, however, that they are shallow and would be likely easily influenced by her not sensing that what she said was going to hurt her chances to avoid her father or hurt her chances to keep her mother comfortable and happy. I think they are real, I think they are genuine, I think they are intense, but I do not believe that they are deep." When asked whether Jennie Katherine's wishes to continue to live with her mother should be considered, he responded the wishes of a fourteen year old child should be entertained, but, in Jennie Katherine's case, it was his belief that because of the symbiotic relationship she and Nancy share, Jennie Katherine did not have an option to answer differently when asked her preference of custody. Dr. Masur stated that as a result of the turmoil Jennie Katherine has experienced she was slightly immature for her age, depressed, anxious, easily tearful, and fragile, and that these traits have not changed much since he began seeing her. Furthermore, he stated that no change in the psychological makeup of Jennie Katherine over this time period was a significant event concerning Jennie Katherine's overall emotional health. Lastly, Dr. Masur stated that it would be uncomfortable for Jennie Katherine to be wrest from her mother's custody given the symbiotic relationship they share, but she would get better because the feelings concerning her father, though genuine, were only superficial.
¶ 26. Jennie Katherine's direct testimony at trial shows that she did not hate John and his side of the family, but only because she did not care enough about them for her emotional state to rise to the level of hate. Jennie Katherine testified that she did not care if she ever saw her *994 father or his family again, but could not explain why she felt this way. Dr. Morris testified that this level of disregard for her father without any justification is abnormal and detrimental to Jennie Katherine's emotional health. Even more disturbing, when asked about her feelings if her grandparents were to pass on she responded, "I guess it would bother me," and when asked the same question regarding her father, she stated it would be fine with her if he died the next day.
¶ 27. While visitation issues should not normally be considered by the lower court when hearing a plea for custody modification, the supreme court has identified that interference with visitation may constitute a material change in circumstances given sufficient severity. Indeed, "a non-custodial parent's right to visitation has been described as `a right more precious than any property right.'" Mord v. Peters, 571 So.2d 981, 983 (Miss.1990) (quoting Biamby v. Biamby, 114 A.D.2d 830, 494 N.Y.S.2d 741, 742 (1985)). The Ash court made clear that it did not wish to create a standing rule with that opinion, but we are bound by the same standard of review, and from the specific facts presented to us we cannot say the chancellor erred. To be clear, while any of the events, when viewed in isolation, would not rise to the level permitting a change in custody, when viewed together, in addition to their effect on the emotional well-being of Jennie Katherine, we cannot say the chancellor committed manifest error or abused his discretion in finding a material change in circumstances that adversely affected Jennie Katherine.
II. WHY DID THE CHANCELLOR SUBSTITUTE THE FATHER'S DESIRE FOR CONTROL AND CUSTODY OVER THE CHILD'S BEST INTERESTS?
¶ 28. Nancy next argues that the lower court erred in holding that a custody change was in the best interests of Jennie Katherine. As is well settled, the factors that must be utilized to determine if a custody change is in the best interests of a child were enumerated in Albright v. Albright, 437 So.2d 1003 (Miss.1983). The factors used to determine what is in the "best interests" of a child with regard to custody are: (1) age, health and sex of the child; (2) determination of the parent that had the continuity of care prior to the previous modification; (3) which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of the parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. Albright, 437 So.2d at 1005.
¶ 29. Chancellor Littlejohn complied with the mandate of Albright, but Nancy argues that the lower court erred in its application of several factors. Indeed, if a chancellor improperly considers and applies the Albright factors we are obliged to find error. Hollon v. Hollon, 784 So.2d 943(¶ 11) (Miss.2001). To determine if a chancellor abused his discretion in such a way, this Court must review each factor along with the evidence and testimony presented at trial pertaining to each factor. Hollon, 784 So.2d at (¶ 13).
Age, health, and sex of the child
¶ 30. Chancellor Littlejohn found this factor to be equal between the parties. *995 Nancy suggests that this was an abuse of discretion as, when viewed in light of the second factor, continuity of care, it is extremely important for Jennie Katherine to have the same maternal influence she has had the past seven years, especially given the maturation issues Jennie Katherine will surely experience over the next few years. In effect, Nancy argues that as a result of Jennie Katherine's sex and the fact that Nancy has had custody in the past, Chancellor Littlejohn should have found in her favor under this factor. Her argument is flawed. Chancellor Littlejohn noted in his opinion that in the 2000 amendment to Mississippi Code Annotated § 93-5-24 (Rev.2004), the legislature explicitly stated that there shall be no presumption that the best interests of a child are furthered by awarding custody to a mother. Therefore, this factor should not automatically be viewed to favor the parent who shares the child's sex. Given Jennie Katherine's extended family, on John's side, in and around New Albany, the fact that Jennie Katherine is female does not weigh more in favor for Nancy than John, as such, the lower court did not abuse its discretion in finding this factor to be equal.
Continuity of care since the last modification hearing
¶ 31. While the lower court did not explicitly state as such, it is apparent from the record that this factor was decided in favor of John. The lower court identified the fact that Nancy had custody of the child prior to the trial and since separation, but did not find this factor in her favor as a result of her intentional and repeated deprivation of John's visitation with Jennie Katherine. After a review of the record, we must disagree with the lower court's determination of this factor. While it is obvious from the parties procedural history and testimony at their most recent trial that Nancy has purposefully and repeatedly denied John his right to visitation with his daughter, it is equally obvious that she has acted as Jennie Katherine's primary caregiver since the parties separated seven years prior to their most recent modification trial. Taking into account John's visitation time, both realized and denied, this still holds true. The record simply does not show that John was more involved with Jennie Katherine's day-to-day needs than Nancy. That is not to say that John was not involved in Jennie Katherine's life, as the record indicates that he was during normal visitation and the three month makeup visitation during 2004, only that Nancy had more involvement with Jennie Katherine's day-to-day care on a more continuous basis. Therefore, we must find this factor in favor of Nancy.
Parenting skills
¶ 32. Chancellor Littlejohn found this factor to be in John's favor. The lower court called Nancy's parenting skills into question as a result of the actions she took since the last custody hearing. These included sneaking a cell phone to Jennie Katherine during John visitation and intentionally setting up activities during the summer for Jennie Katherine that would substantially interfere with John's visitation time, which the lower court specifically found was done to embarrass John. Nancy argues that the chancellor confused the issues of contempt and the best interests of Jennie Katherine, and, as evidenced by Jennie Katherine's grades, social activity, and overall maturation, she has the better parenting skills. Nancy fails to realize that her actions significantly undermine the non-custodial parent and further Jennie Katherine's emotional hindrance through the parental alienation syndrome. As the lower court pointed out, Nancy's *996 actions were "beyond the realm of reasonable behavior and contrary to the best interests of [Jennie Katherine]." Additionally, the evidence presented at trial showed that John possessed sufficient parenting skills. Jennie Katherine's stay with John during his make-up visitation, following Nancy's failure to deliver Jennie Katherine or contact John for several months, is evidence of this. While in New Albany, Jennie Katherine socialized with her friends, achieved high scholastic marks, and regularly attended church with her extended family.
¶ 33. We find that the chancellor did not abuse his discretion by finding this factor favored John. Nancy's argument that the lower court confused contempt with Jennie Katherine's best interests is lacking. Nancy's actions that led to a finding of contempt, and their result on Jennie Katherine's emotional health, are central to her overall ability to parent. As such, consideration of her actions and inactions by the lower court was proper.
Employment of the parent and responsibilities of that employment
¶ 34. The lower court found this factor to favor neither parent. The record shows that both John and Nancy were gainfully employed. Neither party has issue with this factor and we find that the record supports the chancellor's finding.
Physical and mental health and age of the parents
¶ 35. Again, the lower court found this factor to favor neither party. We find that the record fully supports the lower court's determination as to this factor.
Emotional ties of the parent and child
¶ 36. The lower court found this factor favored neither party. Nancy takes issue with this finding, and after a review of the record we must agree. Chancellor Littlejohn identified the strong emotional ties Nancy and Jennie Katherine share, but noted that Dr. Masur labeled their relationship as symbiotic and that it, in the lower court's opinion, gave rise to parental alienation syndrome. The lower court continued to find that John loves Jennie Katherine and that the "emotional ties are really deep down seated between the father and the mother." However, the record does not support a finding that this factor favors neither parent, as the overwhelming and obvious emotional tie between Nancy and Jennie Katherine, however destructive to Jennie Katherine's emotional health, overshadowed any relationship between Jennie Katherine and John. While we find this factor to favor Nancy, its benefit in the totality to Nancy is lessened by the fact Dr. Masur testified that the relationship Nancy and Jennie Katherine shared was actually unhealthy.
Moral fitness of the parent
¶ 37. The lower court was not presented with any proof that indicated that either parent was morally unfit and found as such.
The home, school, and community record of the child
¶ 38. The chancellor reasoned that the evidence before him showed that Jennie Katherine could function equally well in Oklahoma or Mississippi and found this factor to favor neither party. Nancy argues that Jennie Katherine's successes are a result of Nancy's care and "the trial court erroneously removed [Jennie Katherine] from a known home, school, and community environment to a new home, school, and community." The record shows that Jennie Katherine has an established social network in New Albany and Tulsa, she performs equally well academically at both locations, and has actually spent more time living in Mississippi than Oklahoma. Additionally, at the time *997 of trial Nancy was in the process of moving to Memphis, Tennessee, yet another new location for Jennie Katherine to become accustomed. Given those facts, we cannot say that this factor would not more readily tend to favor John, but the role of this Court is not to substitute our judgment for that of the chancellor, and, as the facts contained in the record support his conclusion, we find he did not abuse his discretion in finding this factor favored neither party.
The preference of the child
¶ 39. Jennie Katherine, without question, testified that she would rather live with her mother, and the lower court initially found this factor to favor Nancy. Nancy argues that Jennie Katherine's preference should have been given significant weight in the chancellor's decision, if not directly followed. While Mississippi Code Annotated § 93-11-65 (Rev.2004) "allows a child who has attained the age of 12 to state her preference to the court as to whether she would rather live with her mother or father . . . the trial court is not bound to follow the child's preference." D.A.P. v. C.A.P.R. (In re E.C.P.), 918 So.2d 809(¶62) (Miss.Ct.App.2005). Chancellor Littlejohn cited Dr. Masur's testimony that while Jennie Katherine was fourteen at the time of trial, her emotional development was not in step with her physical age, and referred back to his reasoning in factor six. We also note Dr. Masur's testimony to the fact that because of the symbiotic relationship Nancy and Jennie Katherine share, and the effect that relationship has on her, she may not have another option than to claim her mother is who she prefers to live with. The lower court found that as a result of the shallowness of Jennie Katherine's feelings toward her father and the effect of the parental alienation syndrome it could not determine Jennie Katherine's true feeling regarding her father. Additionally, the chancellor noted the testimony of Dr. Morris indicating that Jennie Katherine was excessively dependent upon Nancy, and this dependancy could lead to problems in Jennie Katherine's psychological future. Based on the evidence in the record and the lower court's due consideration of this factor, we find the chancellor did not abuse his discretion in not following the stated preference of Jennie Katherine.
Stability of the home environment and employment of each parent
¶ 40. The lower court found this factor to favor neither parent, as conceded by Nancy. The record supports this finding.
Other factors relevant to the parentrelationship
¶ 41. The lower court also viewed the existence of a geographically close extended family as a factor favoring John. The record showed that other than a half sister who lives in Jackson, Mississippi, Jennie Katherine had no family present, save Nancy. Nancy does not dispute this finding, and as the record adequately supports such a finding, we agree with same.
¶ 42. We also note that the purpose of the Albright factors is to determine what is in the best interests of Jennie Katherine. Furthermore, two of the three experts that testified stated that the situation Jennie Katherine was currently in and the dependent relationship she shared with her mother was not in the best interests of Jennie Katherine, which would obviously favor John. It is apparent that the doctors' testimony was appropriately considered throughout the lower court's analysis.
¶ 43. "While the Albright factors are extremely helpful in navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula. Determining custody of a child is not an exact science." Lee v. Lee, 798 So.2d 1284(¶ 15) (Miss. *998 2001). Subsequent to our review of the record and the Albright factors, three factors favored John while two favored Nancy. It is clear that the number of factors attributable to John or Nancy is not substantial. However, the polestar consideration of the lower court is the best interests of Jennie Katherine. While we did find that the chancellor erred in his determination of two factors, based on the chancellor's overall analysis and consideration, together with the testimony given at trial, especially that of Dr. Morris and Dr. Masur, we cannot say, after a review of the Albright factors viewed in their totality, that the lower court abused its discretion or was manifestly wrong in the determination that the best interests of Jennie Katherine would be served by a change in custody. As such, we affirm the lower court's ruling.
¶ 44. THE JUDGMENT OF THE CHANCERY COURT OF UNION COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.