**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 97-CT-01453-SCT**

*VIRGINIA KEARSE HADDON*

*v.*

*WERNER SCOTT HADDON*

**ON WRIT OF CERTIORARI**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/14/97 |
| TRIAL JUDGE: | HON. HARVEY T. ROSS |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEPHEN L. THOMAS |
| ATTORNEY FOR APPELLEE: | W.O. LUCKETT, JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND RENDERED- 03/30/2000 |
| MOTION FOR REHEARING FILED: | 4/28/2000; denied 2/1/2001 |
| MANDATE ISSUED: | 2/8/2001 |

**EN BANC.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

¶1. The question presented in this appeal is whether a non-custodial parent who agrees to a custody and visitation arrangement for his infant son has produced sufficient proof to justify amendment of the agreement a little more than six months after it was reached. The chancellor found that the custody and visitation agreement should be amended. A divided Court of Appeals affirmed. *Haddon v. Haddon*, No. 97-CA-01453-COA (Miss. Ct. App. Apr. 20, 1999). We granted certiorari, and after due consideration we reverse the judgments of the Court of Appeals and the Chancellor and reinstate the custody and visitation agreement of the parties ordered into effect by the trial court on December 30, 1996.

I.

¶2. Virginia Kearse Haddon and Dr. Werner Scott Haddon were married on December 4, 1993, in Columbia, South Carolina. One child, Nicholas Kearse Haddon, was born of this union on May 29, 1996.

¶3. In the summer of 1996, Virginia Haddon and Nicholas moved to Clarksdale because Scott Haddon wanted to establish a medical practice there. Scott Haddon did not move with the family initially, but remained in Houston, Texas, until October of that same year. Three weeks after Scott Haddon reunited with his family in Clarksdale, the couple separated. On October 19, 1996, Virginia Haddon moved with Nicholas to Orangeburg, South Carolina, to live with her parents. Scott Haddon remained in Clarksdale.

¶4. On November 18, 1996, Scott Haddon filed a complaint for custody of Nicholas in the Coahoma County Chancery Court. Virginia Haddon filed a parallel action in South Carolina. On December 30, 1996,

the parties announced to the Coahoma County Chancery Court that they had reached a settlement. Consistent with the settlement, the chancellor entered an order awarding joint legal custody to Virginia and Scott, with Virginia enjoying primary physical custody. Scott was awarded visitation with Nicholas one weekend each month. This visitation was to take place in the home of and under the supervision of Scott's mother, who resided in Cary, North Carolina, until Nicholas reached two years of age; thereafter, visitation would be unsupervised. Additionally, Scott was awarded one week of visitation with Nicholas during Christmas and two weeks in the summer.

¶5. The December 30, 1996, order also provided that after Nicholas reached age two, the parties might alter the visitation schedule to comport with the travel and schedule requirements of Scott and Virginia. The order further provided for additional visitation if the parties mutually agreed to it.

¶6. On July 9, 1997, Scott filed a motion to change child custody or, in the alternative, to alter substantially the visitation schedule.

¶7. On September 16, 1997, Virginia Haddon filed a contempt action against Scott, stating that he had refused to return Nicholas from visitation according to the agreed order. By order dated September 19, 1997, the chancery court found Scott in contempt, ordered him to make arrangements to turn over Nicholas to his mother, ordered him to pay Virginia's attorney's fees and expenses and ordered his visitation privileges suspended until the hearing on his motion to change child custody.

¶8. At the hearing on the motion to change custody Scott testified that Virginia had turned over Nicholas for visitation according to the order but had failed to confer with him "regarding multiple issues concerning Nicholas" and had produced a written list of demands that Scott was supposed to follow concerning Nicholas's care; that he was much more "emotionally stable" than his wife; that he had experience raising children gained from his son from a previous marriage; and to the difficulties of the travel involved and setting up care for Nicholas for one weekend a month. As for the changes since the agreed order, Scott testified that Nicholas was older and not as dependent on Virginia; that Virginia did not confer with him regarding important issues like medical care; and to the hostility between Scott and Virginia's family. It also became apparent at the hearing that Scott had twice taken Nicholas in violation of the visitation terms of the agreed order, though he had been held in contempt once. Scott also admitted in the hearing, and wrote a letter to Virginia stating, that he had taken Nicholas to attempt to force Virginia to consider reconciliation with him.

¶9. On October 14, 1997, the chancellor entered an order which granted Scott's motion as to visitation. The order made the following findings:

> Nicholas was born May 29, 1996. and is now almost two years of age. He apparently will start kindergarten at age five which will occur in the year 2001. Until that time an opportunity exists here to allow the father to establish a meaningful parental bond with his child. Due to the distance involved and attendant travel expenses, frequent weekend visitations are inappropriate. In order to allow both joint parents maximum association with the child during this period a change of visitation arrangements from those set out in the December 30th decree must be made. Accordingly, during the period until Nicholas starts to school Scott will be entitled to the following visitation:

> a) During the remainder of 1997, from the weekend of November 15, until December 1.

b) During the year 1998, February, April, June, August, October and December.

c) During the year 1999, February, April, June, August, October and December.

d) During the year 2000, February, April, June, August, October and December.

e) During the year 2001, February, April, June, August, October and December.

When Nicholas reaches age five in the year 2001, the above scheduling will cease. Primary physical custody of Nicholas will continue with [Virginia] and at that time the Court following an appropriate hearing will establish a visitation schedule for Scott.

¶10. Also on October 14, 1997, Scott Haddon filed for divorce from Virginia Haddon, asking for permanent legal and physical custody of Nicholas.

¶11. The Court of Appeals affirmed by a vote of 7-3, finding that visitation matters were within the chancellor's discretion, and that the chancellor in this case had not abused his discretion in finding that increased visitation was in the best interest of Nicholas and allowed for "maximum association" between Scott and Nicholas, and that hardship on Scott because of the distance involved could be considered, though not as a primary consideration. The Court of Appeals dissent found that there was little or no justification in the record for such a drastic modification of an agreed visitation schedule that had been entered into only six months before modification was requested. The dissent found that there was little evidence that the agreed visitation was not working, other than Scott's dissatisfaction with the agreement that he made.

II.

¶12. The proper standard of review, as cited by the Court of Appeals, may be found in *Clark v. Myrick*, 523 So.2d 79, 83 (Miss. 1988):

In cases where the terms of visitation are at issue, our familiar change in circumstances rule has no application. *Cox v. Moulds*, 490 So.2d 866, 869 (Miss.1986). This is true because the court is not being asked to change the permanent custody of the child. *Cox*, 490 So.2d at 869; *Sistrunk v. McKenzie*, 455 So.2d 768, 770 (Miss.1984). In *Cox*, this Court stated:

All that need be shown is that there is a prior decree providing for reasonable visitation rights which isn't working and that it is in the best interest of the children as fostering a positive and harmonious relationship between them and their divorced parents to have custody provisions made specific rather than flexible and attendant vague.

*Cox*, 490 So.2d at 869.

Applying this rule to this case, the opposite is also true, to-wit: all that need be shown is that there is a prior decree providing for reasonable visitation rights which is working and which is in the best interest of the child. On visitation issues, as with other issues concerning children, the chancery court enjoys a large amount of discretion in making its determination of what is in the best interest of the child. *Harrell v. Harrell*, 231 So.2d 793, 797 (Miss.1970). The specification of times for visitation rights is committed to the broad discretion of the chancellor. *Cheek v. Ricker*, 431 So.2d 1139, 1146

(Miss.1983); **Buntyn v. Smallwood**, 412 So.2d 236, 238 (Miss.1982).

The chancellor did not expressly find that Laura's best interest would be served by leaving the 1983 agreed decree visitation provisions in effect. He found simply that there was no evidence introduced at the hearing to warrant any change in those earlier visitation provisions. Assuming as we are required to do that the chancellor resolved all fact issues in favor of the appellee, it appears that there was ample credible evidence to support this determination by the chancellor.

¶13. The parties agreed to the visitation arrangements in this case in December 1996. It appears that little or nothing had happened between that time and Scott's complaint for modification that could not have been reasonably anticipated by the parties. Nicholas was older; there was a vague accusation that Virginia had not conferred with Scott on medical matters; and there was evidence of hostility between Scott and Virginia's family, understandable under the circumstances. Scott also testified that it was difficult to set up the visitation for his one weekend visitation per month.

¶14. This Court finds that there is little evidence of the original visitation agreement not working in July 1997, when Scott filed his complaint to modify. If the agreement was in the best interest of the parties, including Nicholas, in December 1996, when it was agreed to by the parties, then there is little to show that it was not still in the best interest of the parties in July 1997. This drastic modification of visitation was not justified by the facts of this case and is not supported by this Court's case law. In **Gardner v. Pettit**, 192 So.2d 696, 697 (Miss. 1966)(quoting **Nowell v. Nowell**, 250 Miss. 805, 810, 168 So.2d 301, 303 (1964)), this Court found that "[i]n the absence of exceptional circumstances warranting departure from the rule, it is not to the best interest of a young child that it be shifted alternately from parent to parent." This case squarely is controlled by **Gardner,** and the modification is not in the best interest of a young child. *See also **Spain v. Holland***, 483 So.2d 318, 321 (Miss. 1986)(change of residence of custodial parent does not per se result in change of custody). The judgments of the Court of Appeals and the Coahoma County Chancery Court are reversed and rendered with the result that we reinstate the custody and visitation arrangements as agreed to by Virginia and Scott and ordered into effect by the trial court on December 30, 1996.

¶15. **REVERSED AND RENDERED.**

**PITTMAN, P.J., SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. PITTMAN, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J., AND COBB., J. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J. DIAZ, J., NOT PARTICIPATING.**

PITTMAN, PRESIDING JUSTICE, SPECIALLY CONCURRING:

¶16. I write today to emphasize the great burden placed on chancellors in deciding matters of child custody. Chancellors have the authority to "make all orders touching the care, custody and maintenance of the children of the marriage. . . ." Miss. Code Ann. § 93-5-23 (Supp. 1999). Attendant to this burden is the duty to exercise common sense in deciding matters affecting the lives of this state's children.

¶17. In the case sub judice, the chancellor entered an order requiring that the custody of 17-month-old Nicholas be alternated between his two parents on a monthly basis. This would require Nicholas to travel between Mississippi and South Carolina monthly. Notwithstanding the fact that there is authority in this state

addressing such a custody arrangement, it is the duty of the chancellor to look to the best interest of the child in making custody decisions.

¶18. In *McRee v. McRee*, the parents, who resided in the same town, shared custody of their child on an alternating monthly basis. *McRee v. McRee*, 723 So.2d 1217 (Miss.Ct.App. 1998). The mother petitioned the court for sole custody when it was determined that she would be moving out of state, alleging that the move constituted a material change in circumstances. *Id.* at 1218. The chancellor did modify custody even though a material change in circumstances did not occur. *Id.* at 1219. The chancellor found that transporting a small child monthly between Texas and Mississippi would be impractical. *Id.* The chancellor also noted that the "two-pronged standard normally used for modification was inapplicable." *Id.*

¶19. The Court of Appeals cited with approval this chancellor's handling of this sensitive matter:

> Chancellors are not supposed to be automatons, mindlessly applying by rote multi-part tests handed down from above. Taking the parties as he found them, with a pre-existing order mandating joint and alternating periodic custody, the chancellor had to determine what was in the best interest of the child. Quickly determining that leaving custody unchanged was impractical, he was not required to force that decision into some general framework that just was not applicable. To look at custody anew and apply the correct *Albright* factors was in the best tradition of what chancellors are supposed to do, and that is to seek equity. See *Bredemeier v. Jackson*, 689 So.2d 770, 776-77 (Miss. 1997).

*Id.* at 1220.

¶20. The chancellor in the case sub judice should have followed the lead of the chancellor in *McRee* and recognized that it would not be in the best interest of Nicholas to be shuttled back and forth on a monthly basis between North Carolina, his mother's home, and Mississippi, his father's home.

¶21. Again, it is the duty of the chancellor not only to apply the law to a specific set of circumstances, but also to exercise careful judgment in deciding matters affecting the lives of our children.

**PRATHER, C.J., AND COBB, J., JOIN THIS OPINION.**

**McRAE, JUSTICE, DISSENTING:**

¶22. The chancellor's decision in this case was as "common sense" as it could be given the facts of this case. Because a chancellor is given wide discretion with regard to visitation and the chancellor in this case found that there was substantial evidence to justify a change in the visitation schedule, I disagree with the majority's decision to reverse.

¶23. The majority cites *Clark v. Myrick*, 523 So.2d 79, 83 (Miss. 1988), for the standard to be applied in changing visitation (as opposed to changing custody).[1] All that is required to be shown is that the prior decree is not working and that a change is in the best interest of the child. In this case, Virginia's move to South Carolina necessarily curtailed both the length and the quality of Scott's visitation. Since it was Scott who was required to visit the child in North Carolina under the supervision of Scott's mother, the time he could spend with his child was reduced by the amount of time Scott spent getting to and from North Carolina. These facts alone should be enough to justify a change in visitation.

¶24. In addition, as stated by the majority, the original visitation agreement provided that after Nicholas

reached age two, the parties could alter the visitation schedule to conform with the travel and schedule requirements of Scott and Virginia. Since Nicholas is now well past two years old, this provision of the original agreement provides sufficient cause to adjust the visitation schedule.

¶25. For practical reasons, children of school age need to reside in one place during the school year. The visitation dispute in this case involves a child who, at the time of the hearing, was a little over a year old. There is no similar impediment that would require this child to remain in a single city and state. There is all the reason, though, why Nicholas should be allowed greater visitation with his father if the two are to have a meaningful relationship. Until the time he enters school, a visitation arrangement where the parents have equal time with Nicholas seems the fairest solution as well as the solution that is in the best interest of the child. The majority, in approving an arrangement where Nicholas spends the vast majority of time with his mother when he has an equally caring and capable father, severely undervalues the father-child relationship. An arrangement where the father is given very little time with his young child can only harm the child. This runs counter to our insistence that the primary consideration in these matters is the child's best interest. We seem to have forgotten that "[i]t is important for a child to have the guidance of a father as well as the special care that only a mother can give." *McCormick v. McCormick*, 293 So.2d 454, 456 (Miss. 1974); *Brownell v. Brownell*, 209 So.2d 187, 188 (Miss. 1968).

¶26. The majority claims that the chancellor's order giving visitation to each parent on alternate months is impractical. However, under the former arrangement, Scott had to fly to North Carolina every month anyway. Under the chancellor's modified order, the only difference would be that Scott would be accompanied by his child. If inconvenience is suffered by anyone under this arrangement, it is Scott, and not Nicholas, who will be inconvenienced.

¶27. The chancellor's ruling in this case was a sensible one that had common sense as a foundation to allow the child to bond with both parents. Obviously, when the child entered school the visitation would change. The decision of the chancellor should be affirmed as he was not in error as to the law and there were facts to support his decision.

**BANKS, P.J., JOINS THIS OPINION.**

1. The majority and special concurring opinions cite cases that deal with custody, not visitation. On visitation matters, the chancellor has broad discretion. In custody matters, we review for abuse of discretion.