ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. Randy Wayne Bolton Jr. sought successfully to modify custody of his son, Tyler Michael Wayne Ward. Tyler’s mother, Stephanie Ann Bolton, had previously received primary physical custody of Tyler when she and Randy divorced in 2003. Stephanie filed a counter-complaint against Randy to recover child-support arrearages. The chancellor awarded Stephanie a judgment for those arrearages. However, the chancellor also deducted from that judgment other money and support that Randy had provided from that judgment. Aggrieved by the Itawamba County Chancery Court’s decision, Stephanie appeals. Stephanie raises the following four issues: (1) the chancery court erred when it modified visitation and allowed Randy to have extended visitation while his complaint for modification of custody was still pending; (2) the chancery court erred by finding a material change in circumstances adverse to Tyler’s best interest; (3) the chancery court erred by finding that Randy should have primary physical custody of Tyler; and (4) after the chancery court found that Randy was in arrears regarding his child-support obligation, the chancellor erred by awarding Randy a setoff against the judgment for the child-support arrearage. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶2. Tyler was born on July 28, 1994. Approximately three years later, Randy and Stephanie were married. Their second biological child Jennifer, was born on March 18, 2002.
 
 [1]
 
 However, due to their irreconcilable differences, Randy and Stephanie were divorced in March 2003.
 

 ¶ 3. The chancery court incorporated Randy’s and Stephanie’s child custody and property settlement agreement into the divorce decree. Accordingly, Stephanie received primary physical custody of Libby, Tyler, and Jennifer, and Randy received visitation rights with the children. The divorce decree also provided that Randy was to pay Stephanie child support in
 
 *604
 
 the amount of twenty percent of his income.
 

 ¶ 4. According to Randy, approximately three months after he and Stephanie had divorced, they resumed cohabitation. Stephanie disputed Randy’s recollection of when they resumed cohabitation. According to Stephanie, she and Randy resumed cohabitation “[a] couple of months” before she, Randy, and the children moved to Las Vegas, Nevada, in January 2005 to help Stephanie’s father run a grocery store that he had acquired. According to Randy, while he was on a short visit to Mississippi to earn some additional money, Stephanie informed him that she did not “need [him][any] more.” According to Stephanie’s version of events, Randy simply left her and the children in Las Vegas. In any event, Randy remained in Mississippi, where he worked for his father’s contracting business. The children remained with Stephanie in Las Vegas. In January 2006, Stephanie and the children moved to Paradise, California, so Stephanie could help her father manage a different grocery store that he had purchased.
 

 ¶ 5. Randy and Stephanie had problems working out the logistics of the children’s travel for visitation with Randy. They had agreed to equal division of the cost associated with flying the children to and from Mississippi. However, Stephanie informed Randy that she did not have the money to split the costs of flying the children to and from their Thanksgiving visitation with Randy. Randy bore the entire expense. In return, Stephanie would pay for round-trip tickets to fly the children to and from their spring break visitation with Randy.
 

 ¶ 6. However, when spring break arrived, Stephanie told Randy that she did not have the money to fly the children to and from Mississippi. Randy was not able to visit with the children during spring break of 2007. When the children visited Randy for their summer visitation during 2007, Randy again paid all of their travel expenses. During that summer visitation, Tyler — who was thirteen years old at that time — informed Randy that he was unhappy living with Stephanie and that he wanted to live with Randy in Mississippi.
 

 ¶ 7. On July 23, 2007, Randy filed a “complaint for modification of divorce judgment.” Within his complaint, Randy claimed that there had been a material change in circumstances that had adversely affected Tyler’s best interest. Randy further claimed that Tyler’s “relationship with [Stephanie] ha[d] deteriorated and [Tyler] ha[d] repeatedly requested to live with [Randy] and his emotional condition and pleas to have his father modify the present custody order ha[d] caused [Randy] and his family to be concerned for [Tyler].” Randy, therefore, requested that the chancellor modify custody and award Randy full legal and physical custody of Tyler.
 

 ¶ 8. One week later, Randy filed a “complaint for emergency relief.” According to Randy, since filing his complaint for modification of custody, he had discovered that Tyler was “afraid to return to his mother in California.” Randy further stated that: “During the forty-eight (48) hours preceding the filing of this Complaint, [Stephanie] has repeatedly contacted and threatened [Randy] and his family alleging that she will prevent [Randy] from exercising visitation with [Tyler].” Randy requested an emergency order granting sole legal and physical custody of Tyler. Alternatively, Randy requested that the chancellor hear his prior complaint for modification of custody.
 

 ¶ 9. When Randy’s summer visitation with the three children ended, Randy put Libby and Jennifer on a flight back to Stephanie. However, Randy allowed Tyler to remain with him in Mississippi. Ste
 
 *605
 
 phanie was not aware that Tyler would not be returning to California with his sisters until Libby and Jennifer got off of their flight.
 

 ¶ 10. On August 14, 2007, Stephanie filed an “answer and counter-complaint for contempt of court and for modification and emergency relief.” In her counter-complaint, Stephanie claimed that Randy was in contempt of the original divorce decree because he had “failed to pay child support,” “failed to abide by the visitation provisions [of the judgment of divorce],” and “failed to pay one-half of all medical, dental, and prescription expenses for the minor children.” Two days later, Randy and Stephanie entered an agreed order. They agreed that Tyler would remain in Stephanie’s custody until the chancery court could hear Randy’s complaint and Stephanie’s counter-complaint. Randy and Stephanie also agreed to meet in Tu-pelo, Mississippi, where they exchanged custody of Tyler.
 

 ¶ 11. On July 9, 2008, the parties went before the chancellor. Libby, who was fifteen years old at that time, testified on that date out of normal order because she was not expected to be able to testify at a later date. For brevity’s sake, Libby’s testimony will be discussed in greater depth as necessary below. In short, Libby testified that: (1) Stephanie often left her, Tyler, and Jennifer alone after school until approximately 9:30 p.m.; (2) Stephanie often left her, Tyler, and Jennifer alone on Saturdays while Stephanie was with her boyfriend; (3) Stephanie’s relationship with Tyler was strained; (4) Tyler was not happy in California; (5) she would miss Tyler if he lived in Mississippi, but she wanted whatever was best for him; (6) Stephanie sometime threatened to prohibit the children from seeing Randy; (7) Stephanie gets upset when Tyler talks to Randy on the telephone and tells Tyler to get off of the phone; and (8) Stephanie disparages Randy in front of the children by calling him a “redneck” and an “unfit parent.” Libby was the only witness who testified on July 9, 2008.
 

 ¶ 12. The parties went back before the chancellor on July 25, 2008. Stephanie was the first witness who testified. Stephanie testified that Tyler was doing fine in California. She disputed Libby’s testimony and called Libby a “fifteen-year-old drama queen.” According to Stephanie, she had never said anything derogatory about Randy in front of the children. She testified that Libby’s testimony to the contrary was not true. Stephanie denied that Tyler was afraid of her. She also denied that she had threatened to prohibit the children from seeing Randy. Stephanie further testified that she never left the children alone. Finally, she denied that she ever said anything to the children suggestive of the idea that Randy did not love them. However, she agreed that it would be “very inappropriate” to make such statements. She also agreed that such statements would not be in the best interests of the children.
 

 ¶ 13. Tyler testified after Stephanie. Stated briefly, Tyler testified that: (1) Stephanie was not involved in his academic progress; (2) Stephanie routinely left him and his sisters alone after school and on Saturdays; (3) he was afraid of Stephanie; (4) Stephanie yells and curses at him every day; (5) Stephanie often has “fits”; (6) during her “fits,” Stephanie yells, curses, and makes derogatory remarks about Randy; (7) although Stephanie had not hit him, he was afraid that she would because she threatens to do so, and she has thrown a remote control at him; (8) Stephanie refused to split the expenses involved with flying the children to their visitation -with Randy; (9) Stephanie told him that “she was going to fix [Randy] and I’m never
 
 *606
 
 going to see him again”; (10) he had heard Stephanie call Randy a “F’ing hillbilly, redneck, [a] hick, [and she] says [that] he can’t take care of a kid, [and that he] can’t even spell his daughter’s name”; (11) on more than one occasion, he had heard Stephanie and his maternal grandfather talk about Randy in a derogatory manner; (12) Stephanie had punished him by not letting him speak to Randy; and (13) after Libby testified on July 9, 2008, Stephanie confronted Libby about her testimony and told her that “all she had to do was tell [the chancellor] that [Libby] want[s] me to come home.”
 

 ¶ 14. After Tyler testified, Libby took the stand again. When asked whether she wanted to change her previous testimony, Libby answered: ‘Tes. And there are some things that I — that I didn’t fully state out correct, and I just wanted to correct them.”
 
 [2]
 
 Libby testified that she did not tell the entire truth when she testified on July 9th. According to Libby, she “was just afraid if I would have said something wrong, that I’m afraid that my dad would have got mad at me or something, so I just didn’t say some stuff.” However, when she was asked how Randy behaves when he “gets mad,” Libby answered,
 
 “he
 
 doesn’t usually get mad at me, but I really don’t know.” Even so, Libby’s testimony was not remarkably different from her previous testimony. The most obvious difference was that she was more forceful in testifying that she would miss Tyler if Randy received custody of Tyler and Tyler moved to Mississippi.
 

 ¶ 15. Testimony had not been completed at the end of the day on July 25, 2008. On her own motion, the chancellor entered an interim order stating that Randy would be allowed to have extended visitation with Tyler until further order of the court. The chancellor also allowed Randy to enroll Tyler in the Itawamba County school system until further order of the court. Randy enrolled Tyler at the Fairview Attendance Center in Itawamba County.
 

 ¶ 16. On December 15, 2008, the parties went back before the chancellor. Randy took the stand and testified that he was never allowed to exercise any visitation with the children unless Stephanie approved of it. Randy also testified that Tyler was not doing well in school while he was with Stephanie in California. According to Randy, while Tyler was living in California, Tyler would call him in the middle of the day when he should have been in school. When Randy would ask Tyler why he was not in school, Tyler would say, “he didn’t go that day.” Randy testified that Tyler was making “Ds and Fs” on his report card in California, and he had been making “As” after Randy had gotten him a tutor while Tyler was living in Mississippi.
 

 ¶ 17. Derrick Shumpert, Principal of Fairview Attendance Center, testified after Randy. During Shumpert’s testimony, Tyler’s school records in California and Mississippi were introduced into evidence. Randy’s mother, Pauline Bolton, also testified. Generally speaking, Pauline’s testimony supported placing Tyler in Randy’s custody.
 

 ¶ 18. Stephanie called her father, Michael Ward, as her first witness. Ward’s testimony indicated that Tyler was thriv
 
 *607
 
 ing under Stephanie’s care and that she should retain custody of Tyler. After Ward testified, Stephanie returned to the stand. Under examination by her own attorney, Stephanie testified that Randy was in arrears regarding his child-support obligation. Among numerous other things, Stephanie also testified that: (1) she and Tyler had a “great” relationship; (2) to demonstrate that she is serious, she sometimes tells Libby and Tyler that she will “break their hands” if they hit each other; (3) she never curses at her children; and (4) “Tyler is playing everybody against everybody.” After Stephanie testified, the chancellor announced that she would not be able to issue a ruling that day, but she would do so in the near future.
 

 ¶ 19. On December 17, 2008, the chancellor issued her oral ruling over the telephone. The chancellor found that there had been a “material and substantial change in circumstances that adversely affects Tyler, and it is in the best interest of Tyler for his father to be awarded custody.” Regarding Randy’s child-support obligation, the chancellor found that Randy was $14,537 in arrears. However, the chancellor allowed Randy credit for $9,801.35 for money that Randy had paid Stephanie at the time that Randy and Stephanie cohabited after they divorced. The chancellor awarded Stephanie a judgment for the $4,735.65 balance that remained. On January 13, 2009, the chancellor entered a written order. The chancellor did not deviate from her previous decision.
 

 ¶ 20. Stephanie filed a motion for a new trial or, alternatively, to alter or amend the judgment. On July 13, 2009, the chancellor entered a supplemental opinion. In her supplemental opinion, the chancellor thoroughly discussed the testimony of the various witnesses. The chancellor then stated the following reasons for finding a material change in circumstances adverse to Tyler’s best interest:
 

 based on the child’s frequently being left home alone by the mother, the mother’s frequent yelling and scolding of the child, the older sibling’s testimony concerning the deteriorated relationship between the mother and the child, and the need for the child to have another place to live, the child’s being increasingly unhappy, miserable, and isolated because of the breakdown in the relationship between mother and child, and the child’s testimony on multiple occasions through the two-year span of this litigation regarding his desire to no longer reside with his mother and his preference to reside primarily with his father.
 

 Aggrieved, Stephanie appeals.
 

 ANALYSIS
 

 I. MODIFICATION OF VISITATION
 

 ¶ 21. Stephanie argues that the chancellor erred by extending Randy’s visitation with Tyler after testimony had not been completed on July 25, 2008. According to Stephanie, the chancellor “effectively modified custody of Tyler without the requisite finding that a material change in circumstances had occurred.”
 

 ¶ 22. “On visitation issues, as with other issues concerning children, the chancery court enjoys a large amount of discretion in making its determination of what is in the best interest of the child.”
 
 Haddon v. Haddon,
 
 806 So.2d 1017, 1021 (¶ 12) (Miss.2000). “The specification of times for visitation rights is committed to the broad discretion of the chancellor.”
 
 Id.
 
 When the terms of visitation are at issue, the “change-in-circumstances” rule does not apply, because the chancellor is not being asked to change the permanent custody of the child.
 
 Id.
 
 at 1019. Fur
 
 *608
 
 thermore, the Mississippi Supreme Court has held as follows:
 

 All that need be shown is that there is a prior decree providing for reasonable visitation rights which isn’t [sic] working and that it is in the best interest of the children as fostering a positive and harmonious relationship between them and them divorced parents to have custody provisions made specific rather than flexible and attendantly vague.
 

 Id.
 
 at 1019-20. In cases where the terms of visitation are at issue, our familiar change-in-circumstances rule has no application.
 
 Id.
 
 at 1019.
 

 ¶ 23. Stephanie cites
 
 Johnson v. Johnson,
 
 913 So.2d 368 (Miss.Ct.App.2005) to support her position that the chancellor’s decision to allow Randy to have extended visitation was actually a modification of custody. In
 
 Johnson,
 
 two parents had received joint legal and physical custody of their four-year-old child.
 
 Id.
 
 at 369 (¶ 3). The mother subsequently filed a complaint to modify custody.
 
 Id.
 
 at (¶ 1). The chancellor declined to modify custody.
 
 Id.
 
 Instead, the chancellor held that the best interest of the child would be to award “primary physical visitation” to the mother.
 
 Id.
 
 The father appealed.
 
 Id.
 
 at (¶ 2). This Court held that:
 

 Regardless of the terminology utilized in the order, the trial court’s order in essence modified the original decree as to custody. We are unwilling to hold that a chancellor may modify custody without finding the requirement of a substantial and material change in circumstances that adversely affects the child’s welfare.
 

 Id.
 
 at 371 (¶ 11). Consequently, this Court found that the chancellor abused his discretion when he modified “the custody arrangement.”
 
 Id.
 

 ¶ 24. We do not find that the circumstances in the case presently before us rise to the level of the circumstances in
 
 Johnson.
 
 In this case, the chancellor did not permanently modify the visitation schedule. The chancellor gave Randy extended visitation, but it was not a permanent resolution. It was a temporary decision that was to be followed with a decision on the merits of Randy’s complaint for modification of custody.
 

 ¶ 25. Under the precise circumstances of this case, we find that the chancellor acted within her discretion when she allowed Randy to have extended visitation with Tyler until the chancellor could resolve the question of whether it would be appropriate to modify custody. The chancellor had heard testimony from Libby and Tyler regarding Stephanie’s threat to prohibit Randy from seeing them. Furthermore, Tyler testified that Stephanie confronted Libby about Libby’s initial testimony. In conjunction with Libby’s follow-up testimony during the second date that the parties went before the chancellor, the chancellor could have reasonably been concerned that Stephanie might attempt to apply pressure to Tyler to change his testimony. Additionally, the chancellor heard testimony that Stephanie and her father spoke disparagingly about Randy in front of the children. Considering the totality of the circumstances, we do not find that the chancellor abused her “large amount of discretion” regarding visitation issues.
 
 Haddon,
 
 806 So.2d at 1021 (¶ 12). Consequently, we find no merit to this issue.
 

 II. MATERIAL CHANGE IN CIRCUMSTANCES
 

 ¶ 26. Next, Stephanie argues that the chancellor erred by finding that there had been a material change in circumstances adverse to Tyler’s best interest. As previously stated, the chancellor’s rationale for her finding was that: (1) Stephanie frequently left Tyler home alone; (2) Ste
 
 *609
 
 phanie frequently yelled at Tyler and scolded him; (3) Stephanie’s relationship with Tyler had deteriorated; (4) Tyler was “increasingly unhappy, miserable, and isolated because of the breakdown” of his relationship with Stephanie; and (5) Tyler testified that he preferred to live with Randy.
 

 ¶ 27. “In child custody modification cases, unless the chancellor was manifestly wrong, clearly erroneous, abused his discretion, or applied an erroneous legal standard, we must uphold his decision.”
 
 Ellis v. Ellis,
 
 952 So.2d 982, 989 (¶ 15) (Miss.Ct.App.2006) (citing
 
 Barnett v. Oathout,
 
 883 So.2d 563, 566 (¶ 6) (Miss.2004)). “The chancellor has the responsibility to evaluate the credibility of witnesses and evidence and we, as the reviewing court, ‘will not arbitrarily substitute our judgment for that of the chancellor who is in the best position to evaluate all factors relating to the best interest of the child.’ ”
 
 Id.
 
 “Additionally, findings of fact made by the chancellor may only be disturbed if they are not supported by substantial, credible evidence.”
 
 Id.
 
 (quoting
 
 Johnson v. Gray,
 
 859 So.2d 1006, 1012 (¶32) (Miss.2003)).
 

 ¶ 28. “[T]o succeed in an attempt to modify custody, the non-custodial parent must show: (1) a material change in circumstances has occurred since the issuance of the judgment or decree sought to be modified, (2) the change adversely affects the welfare of the child, and (3) the proposed change in custody would be in the best interest of the child.”
 
 Ellis,
 
 952 So.2d at 989 (¶ 17) (citing
 
 Lambert v. Lambert,
 
 872 So.2d 679 (¶18) (Miss.Ct.App.2003)). “In making this determination, the totality of circumstances must be considered.”
 
 Id.
 
 at 990. (citing
 
 Ash v. Ash,
 
 622 So.2d 1264, 1266 (Miss.1993)).
 

 ¶ 29. Stephanie claims the chancellor erred in finding that there had been a material change in circumstances which adversely affects Tyler. Stephanie argues that the chancellor incorrectly determined that Tyler had been adversely affected by “frequently being left home alone.” Stephanie notes that there was no testimony that she leaves Tyler home alone. Stephanie is correct. The testimony indicated that Stephanie left Tyler
 
 and
 
 Libby home alone after school and on most Saturdays. Tyler also testified that he is given the option of going to his grandfather’s grocery store after school, but he generally chooses to go home. Tyler also testified that he does not get into trouble when he is at home after school and that staying at home without Stephanie does not bother him.
 

 ¶ 30. Be that as it may, there was also ample evidence that Tyler’s academic performance had been suffering. It is not unreasonable to connect Tyler’s academic performance to the time that he is left unsupervised after school. Libby and Tyler both testified that Stephanie often did not come home until approximately 9:30 or 10:00 p.m. on weeknights. Tyler testified that Stephanie was not involved with his academic progress. In California, Tyler had been making Ds and Fs on his report card. In Mississippi, Randy provided a tutor for Tyler. The evidence indicated that Tyler made three As and two Cs in Mississippi. Stephanie testified that she could not afford a tutor for Tyler. However, there was testimony that she paid for guitar lessons for Tyler. There was also testimony that she also threatened to stop paying for guitar lessons if Tyler’s grades did not improve. When asked on cross-examination if she could have paid for a tutor by following up on her threat to stop paying for guitar lessons due to Tyler’s poor academic progress and then using those funds to pay for a tutor, Stephanie
 
 *610
 
 answered, “[g]ood point.” The chancellor could have reasonably connected Tyler’s relatively poor academic progress with the testimony that Stephanie was not involved with Tyler’s studies
 
 and
 
 the testimony that Stephanie frequently left Tyler under Libby’s supervision.
 

 ¶ 31. Next, Stephanie attempts to mitigate the portion of the chancellor’s rationale in which the chancellor found that there had been a material change in circumstances that adversely affected Tyler in that Stephanie frequently yelled at Tyler and scolded him. According to Stephanie, “there was no testimony to support any adverse affects this had had on Tyler.” We disagree.
 

 ¶ 32. At the outset of this portion of the analysis, we note that there was no evidence that Stephanie had ever physically harmed Tyler. Tyler testified that Stephanie had never hit him. Libby also testified that Stephanie had never hit Tyler. However, there was ample testimony that Stephanie had a volatile temper. Tyler testified that Stephanie yelled at him and cursed at him every day. He testified that she often told him she was going to “knock [him] out.” Tyler also testified that Stephanie threw a remote control at him. Libby testified that Stephanie would sometimes “raise her hand at [Tyler], but she won’t strike him or anything.” Stephanie testified that she tells the children she is going to “break their hands” if they one of them hits the other one. Stephanie qualified that testimony and explained that the children knew that she would never actually harm them. However, in weighing all of the testimony and evidence before her, the chancellor could have reasonably concluded that there was an atmosphere of tension and hostility in Stephanie’s household, and under the totality of the circumstances, Tyler had been adversely affected by that atmosphere. This is particularly true considering the evidence that Tyler often became upset by Stephanie’s temper and that he was increasingly withdrawn.
 

 ¶ 33. Next, Stephanie notes that the “chancellor also referred to a breakdown or deterioration in the relationship between [Stephanie] and Tyler but did not refer to any specific portions of the transcript to support the finding.” It is true that the chancellor did not refer to specific instances to support her finding that there had been a material change in circumstances that adversely affected Tyler because his relationship with Stephanie had deteriorated. However, there was significant evidence to support the chancellor’s finding.
 

 ¶ 34. The chancellor could have reasonably found that Tyler’s relationship with Stephanie had deteriorated based on Stephanie’s threats to prevent Tyler from visiting with Randy. On cross-examination, Libby testified that Stephanie threatened to prevent the children from seeing Randy. Specifically, Libby testified as follows:
 

 usually when I get on the phone with my mom, she says that I can never see my dad again and stuff like that. She usually just says that, “your dad is trying to separate us,” and things like that. And last week I didn’t talk to her, and then yesterday when I talked to her, she started saying that. She started saying, “I’m going to fix your dad, you’re never going to have to come back down there [to Mississippi] again and deal with them.”
 

 Tyler corroborated Libby’s testimony that Stephanie had threatened to prevent Tyler from seeing Randy. According to Tyler, “She told me I would never come back.... She told me she was going to fix dad and I’m never going to see him again.” According to Tyler, Stephanie refused to split
 
 *611
 
 the expenses involved with flying the children to their visitation with Randy. Tyler testified that: “Dad asked mom if we were coming down [during spring break], and she told him it was his F’ing responsibility to buy the tickets.” Randy testified that he was never allowed to exercise any visitation with the children that was not approved by Stephanie. “While visitation issues should not normally be considered by the lower court when hearing a plea for custody modification, the supreme court has identified that interference with visitation may constitute a material change in circumstances given sufficient severity.”
 
 Ellis,
 
 952 So.2d at 994 (¶27). “[A] noncustodial parent’s right to visitation has been described as ‘a right more precious than any property right.’ ”
 
 Id.
 
 (quoting
 
 Mord v. Peters,
 
 571 So.2d 981, 988 (Miss.1990)).
 

 ¶85. The chancellor could have also found that Tyler’s relationship with Stephanie had deteriorated because Stephanie attempted to interfere with Tyler’s relationship with Randy. Libby testified that Stephanie gets “upset” when Tyler talks to Randy on the telephone. According to Libby, Stephanie “tells [Tyler] to get off the phone.” Tyler testified that Stephanie had punished him by prohibiting him from talking to Randy on the telephone.
 

 ¶ 36. Finally, the chancellor could have found that Stephanie’s relationship with Tyler had deteriorated because Stephanie disparages Randy in front of Tyler. According to Libby, Stephanie calls Randy a “redneck” and an “unfit parent” in front of the children. Libby testified that when Tyler has tried to talk to Stephanie about living with Randy, Stephanie would say things like, “Why do you want to live with him[?] [H]e’s an unfit parent.” Libby also testified that Stephanie implies that Randy does not really want to see her, Tyler, and Jennifer. According to Libby, Stephanie said that Randy would come to California if he really wanted to see them.
 

 ¶ 37. Tyler also testified that he gets upset by things Stephanie says to Randy over the telephone. According to Tyler, he has heard several upsetting conversations in which Stephanie had called Randy a “F’ing hillbilly, redneck, hick, says he can’t take care of a kid, [and that he] can’t even spell his daughter’s name.” Tyler further testified that, on more than one occasion, he had heard Stephanie and his maternal grandfather talk about Randy in a derogatory manner. Tyler testified that he does not “want to hear that.” The chancellor could have reasonably concluded that it was adverse to Tyler’s best interest to hear Stephanie disparage Randy. The chancellor could have also reasonably concluded that hearing Stephanie speak about Randy in a derogatory manner was a contributing cause to the deterioration of Tyler’s relationship with Stephanie.
 

 ¶ 38. The chancellor was obligated to consider the totality of the circumstances in determining whether there had been a material change in circumstances that was adverse to Tyler’s best interest.
 
 Bredemeier v. Jackson,
 
 689 So.2d 770, 776 (Miss.1997). We cannot find that the chancellor abused her discretion when she found that there had been a material change in circumstances that was adverse to Tyler’s best interest. We find no merit to this issue.
 

 III. BEST INTEREST OF THE CHILD
 

 ¶ 39. Next, Stephanie argues that the chancellor erred when she held that it was in Tyler’s best interest to award physical custody of Tyler to Randy. This Court is bound by a limited standard of review regarding a chancellor’s child custody determination.
 
 T.K. v. H.K.,
 
 24 So.3d
 
 *612
 
 1055, 1062 (¶ 21) (Miss.Ct.App.2010). We will not disturb a chancellor’s factual determination unless it was manifestly wrong or clearly erroneous.
 
 Id.
 
 “Stated differently, we will not disturb the chancellor’s findings of fact if those findings are supported by substantial, credible evidence.”
 
 Id.
 
 “However, we will reverse the chancellor’s judgment if we find that the chancellor applied an erroneous legal standard.”
 
 Id.
 

 ¶ 40. This Court has stated time and time again that the polestar consideration in child-custody cases is the best interest and welfare of the minor child.
 
 Copeland v. Copeland,
 
 904 So.2d 1066, 1074 (¶ 31) (Miss.2004). The factors that must be utilized to determine if a custody change is in the best interest of a child were enumerated in
 
 Albright v. Albright,
 
 437 So.2d 1003 (Miss.1983). Those factors are as follows:
 

 (1) age, health and sex of the child; (2) determination of the parent that had the continuity of care prior to the previous modification; (3) which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of the parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship.
 

 Id.
 
 at 1005. “While the
 
 Albright
 
 factors are extremely helpful in navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula. Determining custody of a child is not an exact science.”
 
 Ellis,
 
 952 So.2d at 997-98 (¶43) (quoting
 
 Lee v. Lee,
 
 798 So.2d 1284, 1288 (¶ 15) (Miss.2001)). Deciding custody of children is perhaps one of the most difficult decisions our courts must make.
 
 Brewer v. Brewer,
 
 919 So.2d 135, 141 (¶ 21) (Miss.Ct.App.2005).
 

 ¶ 41. The chancellor concluded that four of the
 
 Albright
 
 factors favored neither party. Those factors were: which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; moral fitness of the parents; and stability of home environment and employment of each parent. Of the remaining factors, the chancellor concluded that they all favored Randy, and none of them favored Stephanie.
 

 ¶ 42. Stephanie’s sole argument under this heading is that the chancellor erred by separating Tyler from his sisters. Under the catch-all factor described as “other factors relevant to the parent-child relationship,” the chancellor stated: “With regard to the separation of siblings, the Court finds [that Libby] testified to the necessity of [Tyler] residing outside the mother’s residence and with his father in order to have a comfortable living situation, though she later qualified her testimony after intensive discussion with Stephanie regarding her testimony.” Stephanie claims the chancellor committed reversible error. We disagree.
 

 ¶ 43. “There is no ‘hard and fast’ rule that the best interest of siblings will be served by keeping them together.”
 
 Copeland v. Copeland,
 
 904 So.2d 1066, 1076 (¶ 43) (Miss.2004) (quoting
 
 Sellers v. Sellers,
 
 638 So.2d 481, 484 (Miss.1994)). The converse is also true. That is, there is no “hard and fast” rule that the best interest of siblings will be harmed by separat
 
 *613
 
 ing them. Tyler’s older sister, Libby testified that he was not happy in California. When she testified on July 9, 2008, Libby said that she would be “upset” if Tyler did not live with her in California “but as long as he’s happy, that will be fine.” Stephanie notes that Libby changed her testimony when she testified again on July 25, 2008. On direct examination, Libby testified “I just want my brother to come home.”
 

 ¶44. Nevertheless, it was within the chancellor’s discretion to weigh Libby’s initial testimony more heavily than her testimony on July 25, 2008. Stephanie was not in the courtroom when Libby testified on July 9, 2008. Tyler testified that he heard Stephanie confront Libby over the phone after Libby testified on July 9, 2008. Specifically, Tyler testified: “I heard mom tell Libby that all she had to do was tell [the chancellor] that she want[s] me to come home.” Stephanie testified that Libby became upset after Stephanie talked to Libby about her testimony. The chancellor could have reasonably concluded that Libby’s initial testimony was more accurate than her subsequent testimony because Libby was nervous that Stephanie, who was in the courtroom during Libby’s subsequent testimony, would become upset at her. “The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each.”
 
 Barnett v. Oathout,
 
 883 So.2d 563, 566 (¶ 6) (Miss.2004). “We will not arbitrarily substitute our judgment for that of a chancellor who is in the best position to evaluate all factors relating to the best interest of the child.”
 
 Id.
 

 IV. CREDIT AGAINST VESTED CHILD SUPPORT
 

 ¶ 45. In the chancellor’s January 13, 2009 order modifying custody, the chancellor also found Randy in contempt for failure to pay child support in the amount of $14,537 through August 2007. The chancellor then applied credits of $9,801.35 toward the unpaid child support and awarded Stephanie a judgment of $4,735.65.
 

 ¶ 46. In her final issue, Stephanie claims that the chancellor erred by reducing the judgment against Randy for unpaid child-support. Stephanie argues that the chancellor was prohibited from deducting any amount from the judgment for unpaid child support. Stephanie requests that this Court reverse the chancellor’s decision to deduct any portion of the judgment against Randy.
 

 ¶ 47. Courts award child-support to the custodial parent for the benefit and protection of the child.
 
 Smith v. Smith,
 
 20 So.3d 670, 674 (¶ 13) (Miss.2009). “Such benefits belong to the child, and the custodial parent has a fiduciary duty to hold them for the use of the child.”
 
 Id.
 
 “The law remains firm that court-ordered child-support payments vest in the child as they accrue and may not thereafter be modified or forgiven, only paid.”
 
 Id.
 
 “But this does not mean that equity may not at times suggest ex post facto approval of extra judicial adjustments in the manner and form in which support payments have been made.”
 
 Id.
 
 “The noncustodial parent may be entitled to credit for any additional support which he/she has evinced by satisfactory proof to the trial court.”
 
 Id.
 

 ¶ 48. As previously mentioned, the chancellor found that Randy owed Stephanie $14,537 in child-support. The chancellor deducted $2,939 from that figure because Randy presented evidence that he sent that money to Stephanie via Western Union. The chancellor also deducted $1,019.85 from Randy’s child-support ar-rearage because that figure represented one-half of the costs associated with flying the children to and from Randy’s visitation
 
 *614
 
 during Thanksgiving 2007. The testimony at trial indicated that Randy and Stephanie had agreed to split the costs associated with flying the children to and from their visitation with Randy, and Stephanie had never reimbursed Randy for that amount.
 

 ¶ 49. Next, the chancellor deducted $1,995 from Randy’s child-support arrear-age to account for the fact that Randy and Stephanie had lived together after their divorce — specifically, from September 2004 through March 2005. The chancellor multiplied Randy’s $285 per month child support obligation by the seven undisputed months that Randy and Stephanie lived together while divorced. The chancellor reasoned that Randy was providing support for the children during the time that he and Stephanie lived together.
 

 ¶ 50. The chancellor then deducted an additional $2,137.50 from Randy’s remaining child-support arrearage. That figure represented a deduction for the time that Stephanie disputed that she lived with Randy. That is, Randy testified that he and Stephanie were also living together from May 2003 through August 2004. Stephanie disputed that. However, the chancellor multiplied Randy’s $285 per month child-support obligation by fifteen months for a total of $4,275. Because Stephanie disputed that she and Randy lived together during that time, the chancellor reduced that figure by fifty percent for a total deduction of $2,137.50.
 

 ¶ 51. Finally, the chancellor deducted $1,710 from Randy’s child support arrear-age. That figure represented Randy’s $285 per month child support obligation multiplied by the six months that Tyler lived with Randy from July 2008 through December 2008. The chancellor reasoned that equity demanded that Randy receive a credit for that time because Randy was supporting Tyler while Tyler was in his care. Furthermore, because Stephanie was not required to pay for any expenses for Tyler’s care during those months, Randy should not be required to pay any child support for Jennifer during those months.
 

 ¶ 52. The Mississippi Supreme Court has held that “to allow the custodial parent to be compensated for time that the child had lived with the noncustodial parent, absent visitation and other modifications made by the court, would be to unjustly enrich the custodial parent.” Smith, 20 So.3d at 677 (¶ 24) (Miss.2009) (citing
 
 Varner v. Varner,
 
 588 So.2d 428, 435 (Miss.1991)). We are required to leave the chancellor’s findings undisturbed unless “they are manifestly erroneous or demonstrate the application of an erroneous legal standard.”
 
 Smith,
 
 20 So.3d at 675 (¶ 16). Under the circumstances, we do not find that the chancellor’s decision was manifestly erroneous or that the chancellor applied an erroneous legal standard. Accordingly, we find no merit to this issue.
 

 ¶ 53. THE JUDGMENT OF THE ITAWAMBA COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR. RUSSELL, J., NOT PARTICIPATING.
 

 [1]
 

 . Stephanie’s daughter, Elizabeth "Libby” Page Ward is not Randy’s biological daughter; although Randy considers her to be his daughter and Libby considers Randy to be her father. Bom on January 2, 1993, Libby is approximately nineteen months older than Tyler.
 

 [2]
 

 . Stephanie had not attended the proceedings during Libby’s July 9, 2008 testimony. However, Stephanie had read a transcript of Libby’s testimony. Prior to Libby’s second time on the witness stand, Stephanie had talked to Libby about her testimony. Stephanie denied that she confronted Libby or that she had encouraged Libby to change her testimony. Nevertheless, there was testimony that Libby became upset during a telephone conversation with Stephanie and that Stephanie hung up on Libby during that conversation.