# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01540-COA

**DANIEL WESLEY WILDMAN**                                                     **APPELLANT**

**v.**

**JENNEY WEEKS WILDMAN**                                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/15/2018 |
| TRIAL JUDGE: | HON. JERRY G. MASON |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | KACEY GUY BAILEY |
| | J. RICHARD BARRY |
| ATTORNEY FOR APPELLEE: | JASON EDWIN WEEKS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART- 7/28/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     On January 31, 2017, Jenney Wildman filed a complaint for divorce, custody, and related relief against Dan Wildman.  On February 27, 2017, Dan filed an answer and counterclaim for divorce against Jenney.  On May 31, 2018, the parties entered into a consent for divorce, withdrawing all grounds for divorce and agreeing to proceed on the ground of irreconcilable differences.  Although some additional property and custody issues were resolved in the consent, the parties left the following issues for the chancery court to decide at trial: (1) the amount of child support Dan should pay, (2) Dan's alimony obligations, if any, (3) Dan's visitation and frequency of telephonic visitation with the minor children, (4)

payments of the mortgage note, insurance, and taxes on the marital home, (5) the parent responsible to pay for the minor children's private school expenses, (6) equitable division of certain marital assets accumulated during the marriage, (7) parental authority to make final decisions regarding the health, education, and welfare of the minor children, (8) claiming of the minor children as dependents for tax purposes, (9) the appropriate trustee/guardian of Dan's life-insurance proceeds payable to the minor children, (10) payment of attorney's fees, and (11) the date of demarcation for the division of marital assets.

¶2. After a two-day trial, the chancery court issued its final judgment on October 15, 2018. The final judgment ordered Dan to pay Jenney $3,000.00 in monthly periodic alimony and $55,000.00 in lump-sum alimony, to be paid in five installments of $11,000.00 over a two-and-a-half-year period. Further, Dan was ordered to pay Jenney $1,200.00 per month in child support through May 2019, with the payment increasing to $1,800.00 on June 1, 2019. Jenney was awarded exclusive use and possession of the marital home and the equity in the home in the amount of $100,753.00. Jenney was also awarded the remaining funds in the parties' joint savings account at Trustmark Bank ("TBS account") in the amount of $27,129.00, while Dan was awarded the balance of his Valic retirement account ("Valic account") in the amount of $214,620.00. The chancery court determined that the Mississippi Tax Commission Credit Union account ("MSTC account") was not Jenney's property despite her name being on the account but rather held that it was the property of Jenney's father and could not be considered a factor in equitable distribution or alimony. The chancery court denied Dan's request for midweek visitation, every-fifth-weekend visitation and daily

2

telephonic contact with the minor children. The court held that Dan should have visitation every other fifth weekend as well as three phone calls per week with the minor children. Further, the chancery court held that Jenney had the authority to make final decisions regarding the minor children's health, welfare, and education and that each party would claim one child as a dependent for tax purposes. Finally, the chancery court held that Jenney should be named as the trustee/guardian over the minor children for the purposes of receiving any benefits from Dan's life-insurance policy. Aggrieved by the chancery court's ruling, Dan appealed.[1] We affirm in part and reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY

¶3. Dan and Jenney were married on May 24, 2003, and divorced on October 15, 2018. At the time of trial, Dan was thirty-nine years old, and Jenney was thirty-eight years old. Both parties were in good health and gainfully employed in the medical field. The parties have two minor children: D.W. (born in 2009) and J.W. (born in 2011).[2]

¶4. Dan and Jenney both obtained their nursing degrees from the University of Southern Mississippi. After graduation, they got married and gained employment as registered nurses at Rush Hospital ("Rush") in Meridian, Mississippi. In May 2006, Dan and Jenney moved to Chattanooga, Tennessee, for Dan to receive additional training to become a certified registered nurse anesthetist ("CRNA"). While Dan was completing his specialized

---

[1] The following issues are not argued on appeal: (1) attorney's fees, (2) the minor children's trustee/guardian for insurance purposes, (3) award of the marital home and payment of the mortgage and other expenses on the marital home, and (4) payment of private school tuition.

[2] Initials will be used in an effort to protect the identity of the children.

schooling, Jenney was employed as a registered nurse in the intensive care unit at Memorial Northpark Hospital. Rush paid Dan's tuition to attend school and an additional $2,000.00 per month as a living stipend in exchange for his promise to return to work at Rush for five years after completing his CRNA training. After returning to Meridian, Dan worked as a CRNA and at the time of trial was employed by Medical Foundation Inc., where he rotated through multiple hospitals and facilities, including the Meridian Surgery Center. At the time of trial, Dan also provided services on the "heart call team." Dan's monthly net income was $10,049.40. After moving back to Meridian, Jenney continued to work as a registered nurse at the Meridian Surgery Center. There were periods during the marriage when the children were younger that Jenney did not work or worked part-time, but Jenney continued to keep her license current. Jenney testified that she had special experience as an intensive-care nurse and experience as a pre-operative and post-operative nurse, which sets her apart from other registered nurses. At the time of trial, she was employed by the Meridian Surgery Center, working part-time or forty hours every two weeks with a monthly net income of $1,726.34.

¶5.     Dan and Jenney separated on January 23, 2017, after Jenney suspected that Dan was having an extra-marital affair. Dan moved out, taking only his personal belongings, while Jenney and the minor children remained in the marital home. Jenney withdrew $49,500.00 from the parties' joint savings account and $5,000.00 from their joint checking account, for a total withdrawal of $54,500.00, without Dan's knowledge or consent. On January 31, 2017, Jenney filed a complaint for divorce, custody, and related relief, as well as a motion

4

for temporary relief. On February 27, 2017, Dan filed his answer to Jenney's complaint for divorce and a counterclaim for divorce. The chancery court held a temporary hearing on March 28, 2017, on four issues concerning support and other monetary monthly payments. All other temporary issues arising out of the pleadings were agreed to and stipulated to before the hearing, and those stipulations were attached to the court's memorandum opinion and order dated April 4, 2017. In that order, the court ordered Dan to pay, on a temporary basis, (1) $1,200.00 per month in "temporary monthly child support," (2) $1,800.00 per month in "temporary monthly periodic alimony," (3) the balance of the minor children's private school expenses, and (4) the monthly mortgage payment in the amount of $1,507.21.[3] Following the entry of the memorandum opinion and order from the temporary hearing, the parties executed an agreed order, agreeing to deposit approximately $27,129.54 into the registry of the Chancery Court of Lauderdale County, Mississippi.[4] Prior to the final hearing, on May 31, 2018, the parties executed a consent to divorce, and the parties withdrew all fault grounds for divorce and agreed to proceed on the ground of irreconcilable differences. Further, the consent to divorce set out issues that were agreed to by the parties and issues that were in dispute to be determined later by the court. The parties agreed that the chancery court would decide the following issues: (1) the amount of child support Dan should pay, (2) Dan's alimony obligation, if any, (3) what should Dan's visitation schedule be with the parties'

---

[3] The court held that Dan's payment of the monthly mortgage note would be considered half child support and half "temporary monthly periodic alimony."

[4] This amount represents the remaining balance of the monies that Jenney withdrew from the parties' joint savings and checking accounts.

minor children, to include the frequency of telephone contact with the children, (4) payments of the current house debt, insurance, and land taxes for the marital residence, (5) the parent responsible for the children's expenses to attend Lamar School in Meridian, Mississippi, (6) equitable division of all marital assets accumulated during the marriage, (7) parental authority to make final decisions concerning the children's health, education, and welfare if there is a disagreement after Jenney and Daniel have conferred with each other, (8) claiming of the children as dependents for tax purposes, (9) the appropriate trustee/guardian of Dan's life-insurance proceeds payable to the minor children, (10) which party should pay the attorney fees and costs of the other, and (11) the date of demarcation for division of marital assets. On September 17 and 18, 2018, the court held a trial on the unresolved issues and issued its final judgment and memorandum opinion on October 15, 2018. Aggrieved by the chancery court's ruling, Dan filed a motion to alter the judgment on October 25, 2018. On November 29, 2018, the chancery court entered an order denying Dan's motion to alter or amend judgment and a memorandum opinion. Dan appealed. The appeal was assigned to this Court.

## STANDARD OF REVIEW

¶6.     This Court's review of matters of divorce, child support, and alimony are limited. *Ferguson v. Ferguson*, 639 So. 2d 921, 930 (Miss. 1994). "In domestic-relation cases, our review is limited to whether the chancery court's findings were manifestly wrong or clearly erroneous, or the court applied the wrong legal standard." *Gwathney v. Gwathney*, 208 So. 3d 1087, 1088 (¶5) (Miss. Ct. App. 2017). If substantial evidence in the record supports the

6

chancellor's findings of fact, we will not disturb his decision. *Id.* Any legal conclusions of the chancellor are reviewed de novo. *See Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

## ANALYSIS

### I.     Monthly Periodic Alimony

¶7.     The chancery court awarded Jenney lump-sum alimony in the amount of $55,000.00. That amount was to be paid in five equal installments of $11,000.00 every six months until the total was paid in full.[5] Further, the court awarded Jenney monthly periodic alimony in the amount of $3,000.00 per month. Dan argues that the equitable distribution of assets and the lump-sum alimony were sufficient under the law and that the periodic monthly alimony was "clearly erroneous, manifestly wrong and should be reversed." The basis of Dan's argument concerning the monthly periodic alimony centers around mathematical miscalculations, the date of demarcation for asset valuation, equitable division of property and the fact that Jenney had sufficient resources to meet her needs and living expenses, the court's failure to consider all *Armstrong* factors, and his claim that the MSTC account was wrongly classified. Each of the alleged errors as it relates to monthly periodic alimony will be addressed individually below.

### A.     Mathematical Miscalculations

¶8.     Dan argues that the chancery court made three mathematical errors in assigning value to both the parties' marital and non-marital property. We agree there were errors in

---

[5] $11,000.00 was due on each of the following dates: May 1, 2019; November 1, 2019; May 1, 2020; November 1, 2020; and May 1, 2021.

computation but do not find that they warrant reversal. As a result of the three mathematical errors being factored into the equation of equitable distribution, Jenney received an increased benefit of $1,800.00. The parties provided to the chancery court an agreed list of marital property and values associated with each of them. In the court's memorandum opinion dated October 15, 2018, the court assigned the total value of $113,748.00 to Jenney's marital assets, when the true value was actually $116,148.00. Secondly, the court assigned the value of $37,005.00 to Dan's marital assets, when the true value was actually $37,605.00. Lastly, the court assigned the value of $1,125.00 to Dan's non-marital assets, when the true value was actually $1,025.00. [6] Dan asserts that these miscalculations constitute clear error that warrant reversal of the chancery court's award of monthly periodic alimony.

¶9.    There are multiple methods of rectifying mathematical errors within final judgments.

> One acceptable method of dealing with mathematical errors in opinions of chancellors—in addition to remand for recalculation—is discussed in *Dunaway v. Dunaway*, 749 So. 2d 1112, 1116 (¶10) (Miss. Ct. App. 1999): "We will deal with Mr. Dunaway's complaint with the chancellor's addition skills by simply disregarding the computation error and substituting the correct sum for purposes of our analysis."

*Williams v. Williams*, 129 So. 3d 233, 240 (¶24) (Miss Ct. App. 2013). In *Williams*, the chancellor's totals and the appellant's totals differed by $1,136.00. *Id*. at (¶27). The court held, "[W]hile there are obvious mathematical errors as to the total values attributed each party's share of the former marital estate, they cancel each other out and result in distributions not **materially deviating** so as to require reversal of the chancellor." *Id*. (emphasis added).

---

[6] This miscalculation is not considered a factor in monthly periodic alimony.

¶10.   Like the cases in *Williams* and *Dunaway*, we find that these miscalculations pointed out by Dan are not of such an amount that would result in a material deviation from the distribution ordered. Therefore, we disregard the computation error and substitute the correct sums for the purpose of further analysis below. *See Williams*, 129 So. 3d at 240 (¶24). The correct figures are as follows: (1) Jenney's marital assets total $116,148.00, (2) Dan's marital assets total $37,605.00, and (3) Dan's non-marital assets total $1,025.00. This Court will use these totals in the analysis regarding equitable distribution and the appropriateness of an alimony award.

### B.   Date of Demarcation for Property Valuation

¶11.   Dan also argues that the chancery court abused its discretion by using the date of the trial, September 17, 2018, as the date of demarcation to value marital assets rather than the date of the temporary hearing, March 28, 2017. Dan argues that the difference in the marital-asset values between the date of the temporary hearing and the date of the trial adversely affected equitable division. There is a valuation difference in some of the marital asset values between those two dates. For instance, the value of Dan's Valic account was significantly larger on the date of the trial than on the date of temporary hearing. The amount of the Valic account on March 28, 2017, was $177,081.38, and the value of the account on September 17, 2018, was $214,620.00. The chancery court chose the date of demarcation as September 17, 2018, and used the values of the marital assets as of that date.

¶12.   "'The law in Mississippi is that the date on which assets cease to be marital and become separate assets, what we refer to as the point of demarcation, can be either the date

9

of separation (at the earliest) or the date of divorce (at the latest). . . . Ultimately, however, the chancellor has the discretion to draw the line of demarcation. . . .'" *Billingsley v. Billingsley*, 240 So. 3d 422, 433 (¶32) (Miss Ct. App. 2017) (quoting *Randolph v. Randolph*, 199 So. 3d 1282, 1285 (¶9) (Miss. Ct. App. 2016)). Here, the chancery court had full discretion to use either the March 28, 2017 date or the September 17, 2018 date as the date of demarcation. Finding no error in the chancery court's ruling, we affirm as to the issue of the date of demarcation in the valuation of marital assets.

### C. Equitable Distribution of Marital Property and Sufficiency of Jenney's Resources and Assets

¶13. Dan asserts that Jenney was adequately provided for by the property division and the award of lump-sum alimony set out by the chancery court in its memorandum opinion and that therefore she is not entitled to an award of periodic alimony. Further, Dan asserts that Jenney has sufficient resources to meet her needs and living expenses given the potential of her under-utilized, specialized experience. Finally, Dan asserts that the expenses listed on Jenney's Rule 8.05 financial statement are inaccurate,[7] inflated, and do not reflect actual or practical expenses for the current situation for which they find themselves but that given the liquidity of her marital and non-marital assets, Jenney has sufficient resources such that an award of periodic alimony was not proper.

¶14. The chancery court utilized trial Exhibit 16 in its calculations regarding asset distribution.[8] The chancery court found that "[t]he total value of marital property is

---

[7] UCCR 8.05.

[8] The parties stipulated that the values reflected in Exhibit 16 were accurate.

10

$392,502.00 and 50 percent of the total value is $196,251.00." However, the marital property cannot be equally distributed in that amount as a result of tax complications if the court had awarded a withdrawal from Dan's Valic account. In its memorandum opinion and within its analysis of asset division, the court stated:

> However, the marital property cannot be **equally** distributed without a withdrawal from Dan's Valic account. This court finds that "equity demands" that this court determine an alternative to withdrawal from Dan's Valic account and the possible consequence of tax or penalty. This court finds that the better procedure is to grant Jenney lump sum alimony **for the difference in the amounts of equitable distribution to Jenney and to Dan.**

(Emphasis added).

¶15. Based on the chancery court's memorandum opinion, and applying the corrected calculations, the total value of marital property distributed to Jenney was $143,277.00.[9] The total value of marital property distributed to Dan was $252,225.00.[10] The court found that there was a discrepancy between the value of Dan's marital assets and Jenney's marital assets. The difference in the marital estate was $108,948.00.[11]

¶16. "Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit." *Castle v. Castle*, 266 So. 3d

---

[9] This figure includes the equity in the marital home ($100,753.00), the TBS account ($27,129.00), and the value of the additional personal property ($15,395.00).

[10] This figure includes his Valic account ($214,620.00) and the value of the additional personal property ($37,605.00).

[11] The court actually found that the difference in the marital estates was $110,748.00. The amount of $108,948.00 is the corrected figure determined by this Court. While the chancery court computations may have been off by $1,800.00, that does not resolve the fact that there was still a substantial discrepancy between the two marital estates.

1042, 1053 (¶43) (Miss. Ct. App. 2018) (quoting *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003)), *cert. denied*, 267 So. 3d 278 (Miss. 2019). "All property division, lump sum, or periodic alimony payments, and mutual obligations for child support should be considered together. 'Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede.'" *Ferguson*, 639 So. 2d at 929 (quoting *LaRue v. LaRue*, 304 S.E.2d 312, 334 (W. Va. 1983), *overruled on other grounds by Butcher v. Butcher*, 357 S.E.2d 226 (W.Va. 1987)). "Thus, the chancellor may divide marital assets, real and personal, as well as award periodic and/or lump sum alimony, as **equity** demands." *Id.* (emphasis added). This Court is bound to "consider the totality of the chancellor's awards upon the divorced parties, including the benefit to the payee spouse and the concomitant burden placed on the payor spouse." *Castle*, 266 So. 3d at 1053 (¶43) (internal quotation marks omitted) (quoting *Arrington v. Arrington*, 80 So. 3d 160, 167 (¶23) (Miss. Ct. App. 2012)). "Our scope of review of an alimony award is familiar and well settled. Alimony awards are within the discretion of the chancellor, and his discretion will not be reversed on appeal unless the chancellor was manifestly in error in his finding of fact and abused his discretion." *Cogginsv. Coggins*, 132 So. 3d 636, 640 (¶8) (quoting *Armstrong*, 618 So. 2d at 1280).

¶17. Given the discrepancy in value of Dan and Jenney's property division awards, the chancery court held "[t]hat Jenney should be granted lump sum alimony in the amount of $55,000.00. . . ." When the $55,000.00 is added to the $143,277.00, Jenney received a total equitable distribution of half of the marital estate of $198,277.00. The document the court

relied on shows that the total of the marital estate according to the parties' stipulation was $395,502.00.[12] Further, the parties agreed to some of the items of property distribution and the amount of the property distribution. The court split the total value of the marital estate of $395,502.00 by fifty percent to determine that $197,751.00 represented half of the marital estate and the amount Jenney was entitled. The court obviously awarded lump-sum alimony to cure a deficit after the marital property distribution, which left Jenney with $143,277.00. But when the lump-sum alimony is added into Jenney's share, she now has a total equity distribution of $198,277.00. In the end, Dan received $252,225.00, and Jenney received $198,277.00.[13] While Jenney received less of the total marital estate, the matter was complicated by the inability to withdraw from Dan's Valic account due to tax consequences. Jenney did receive half of the marital property value when considering lump-sum alimony. Dan claims that because Jenney got a sufficiently equal distribution of the marital estate, the chancery court should not have granted an additional award of $3,000.00 in monthly periodic alimony. We disagree. The particular facts of this case clearly demonstrate Jenney had a monthly deficit after all income and expenses were considered. However, as result of Jenney having the relative ease of being able to double her income by working full-time instead of part-time and the deficit causing affect on Dan's monthly expenses as a result of the monthly periodic alimony awarded, we find the **amount** of monthly periodic alimony awarded was error.

---

[12] This figure is this Court's corrected figure. The chancery court's original figure was $392,502.00.

[13] $143,277.00 plus the award of $55,000.00 lump-sum alimony equals $198,277.00.

¶18. Permanent periodic alimony serves an important purpose as a "substitute for the marital-support obligation." *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶11) (Miss. 2011). More specifically,

> [t]he award of permanent periodic alimony arises from the duty of the husband to support his wife. **We have also said that the husband is required to support his wife in a manner to which she has become accustomed, to the extent of his ability to pay.** To update our language: Consistent with *Armstrong*, a financially independent spouse may be required to support the financially dependent spouse in a manner in which the dependent spouse was supported during the marriage, subject to a material change in circumstances.

*Castle*, 266 So. 3d at 1053 (¶43) (emphasis altered) (quoting *Rogillio*, 57 So. 3d at 1250 (¶11)). This duty, however, is not absolute. A spouse who seeks alimony must have "a deficit with respect to having **sufficient resources and assets to meet his or her needs** and living expenses." *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013) (emphasis added). In *Tilley v. Tilley*, 610 So. 2d 348, 354 (Miss. 1994), the Supreme Court addressed the issue of income deficit by the paying spouse stating the following:

> The other problem is Richard Tilley's debt burden. According to the record, Richard Tilley will have to pay $11,038.34 a month under the terms of the judgment, but only has a monthly income of $7,306.00. It appears the chancellor was either punishing Richard Tilley for the grounds for divorce, or flatly ignoring his resources. **Richard has not even been left enough monthly income for a standard of living, much less a reasonable one.** In Mississippi, alimony should be awarded to the wife in accordance with her needs with consideration being given to the ability of the husband to make the payments. *Dudley v. Light*, 586 So. 2d 155, 161 (Miss. 1991); *Brendel v. Brendel*, 566 So. 2d 1269, 1272 (Miss. 1990). Alimony is not a punishment and should not be so used. *Taylor v. Taylor*, 348 So. 2d 1341, 1344 (Miss. 1977) (Smith, J., dissenting). However, it seems clear the chancellor might have been trying to punish Richard Tilley for his actions.

(Emphasis added). This Court held in *Ewing v. Ewing*, 203 So. 3d 707, 715-16 (¶29) (Miss

Ct. App. 2016):

> In determining the amount of support payable to the wife, a chancellor **must consider** 'not only **reasonable needs of [the] wife** but also [the] **right of [the] husband to lead as normal a life as reasonably possible with a decent standard of living**.' *Davis*, 832 So. 2d at 497 (¶19) (quoting *Massey v. Massey*, 475 So. 2d 802, 803 (Miss. 1985)). Here the chancellor did not take Morgan's standard of living into account. While the $500 monthly payments alone might be considered reasonable, the chancellor did not assess the award in relation to Morgan's payments for child support, lump-sum alimony, and attorney's fees. Thus, **the amount of the award of periodic alimony should be considered in light of the amounts of the other payments on remand.**

(Emphasis added). In *Gray v. Gray*, 562 So. 2d 79, 83 (Miss. 1990), the Supreme Court stated that the "chancellor should consider the **reasonable needs** of the wife and the **right of the husband to lead as normal a life as possible with a decent standard of living**." (Emphasis added). "A payor must be left with sufficient income to meet basic needs. A court erred in setting total child support and alimony awards in an amount exceeding the payor's disposable income after basic needs were met." Deborah H. Bell, *Bell on Mississippi Family Law* § 9.04[4][d] (2d ed. 2011) (citing *McEachern v. McEachern*, 605 So. 2d 809, 814-15 (Miss. 1992)). In *Yelverton v. Yelverton*, 961 So. 2d 19, 28 (¶18) (Miss. 2007), the Mississippi Supreme Court granted a petition for writ of certiorari and reversed the decision of this Court that had affirmed the chancery court's ruling regarding an award of periodic alimony. The Supreme Court stated in part:

> Thus, although recognizing that James had to spend $6,429 per month on his expenses, the chancellor ordered James to pay Rhonda $10,000 per month. This award would give Rhonda approximately $12,118.65 a month, although her monthly expenses totaled only $6,000, and would leave James with a negative balance of $4,429 per month. **Such action by the chancellor leaves James destitute and in hopeless continuous contempt of court.**

15

(Emphasis added).

¶19.    In this case, Jenney worked part-time as a registered nurse and earned $2,282.03 per month, with $1,726.34 as take-home pay.  The chancery court awarded Jenney child support for the first twelve months at $1,200.00 per month and $1,800.00 per month thereafter. Using the $1,800.00-per-month child support figure, added with Jenney's part-time take-home pay, she yields a monthly net income of $3,526.34.  Jenney's Rule 8.05 financial statement, dated September 15, 2018, showed combined expenses on behalf of herself and the minor children, totaling $4,794.56.[14]  However, as a result of the chancery court judgment awarding Jenney the marital property, she has now acquired the monthly mortgage payment of $1,625.77. After adding the mortgage payment, Jenney's monthly expenses now total $6,420.33. Jenney testified at trial that the expenses listed on her Rule 8.05 financial statement are her actual "needs."  That leaves Jenney with a deficit each month of $2,893.99.[15]

¶20.    Dan's Rule 8.05 financial statement listed his net monthly income as $10,049.40.  Dan was not awarded any cash assets that would assist him in meeting any of the monthly obligations ordered.  Dan's Rule 8.05 financial statement demonstrates that when his new support obligations of child support, periodic alimony, and lump-sum alimony are combined with his new monthly expenses, his total monthly expenses are $11,391.21.  This figure is

---

[14] Jenney's Rule 8.05 financial statement listed her combined expenses as $4,794.56. Dan claims that Jenney's expenses were inflated.  The chancery court commented on Jenney's inaccurate expenses but never gave an adjusted total amount.  This Court will use the figure that the chancery court used.

[15] Total income of $3,526.34, minus the total expenses of $6,420.33, equals $2,893.99. The total income was determined from adding her part-time income of $1,726.34 and $1,800.00 in child support.

reflective of the first phase of child support, wherein he was ordered to pay $1,200.00 per month in child support, private school expenses, and the fact that he is no longer responsible for the mortgage payment on the marital home. Given these figures, Dan's monthly expenses exceed his monthly income by $1,341.81. Beginning June 1, 2018, Dan's child support increased to $1,800.00 per month, and his obligation to pay private school expenses was terminated. Dan's monthly expenses beginning June 1, 2018, and each month thereafter totaled $10,900.21. Given these figures, Dan's monthly expenses exceeded his monthly income by $850.81. Further, these calculations do not consider Dan's obligations on behalf of the minor children that are either undeterminable or not applicable at the current time. These expenses include: two-thirds of the total of uncovered medical bills incurred by the minor children, total cost of a vehicle for each child, total cost of vehicle insurance for each child, and half of "after high school education expenses" for the minor children. Finally, these calculations are based on expenses related to Dan's living in an apartment.

¶21. The record reflects that Jenney has specialized training as an intensive care nurse and experience as a pre-operative and post-operative nurse. Jenney admitted that this training sets her apart from other nurses. However, at the time of trial, Jenney was not fully utilizing her specialized experience; she was working part-time. Jenney testified at trial, "I'm not applying for work anywhere. I have a stable job that I'm happy in and that is secure." She further testified that she was not willing to apply for other jobs. Jenney made it clear in her testimony at trial that she is unwavering in her position that she will not make any adjustments to her employment situation despite her specialized employment experience or

17

her monthly needs and expenses. Finally, in addition to her monthly child-support payment and as a result of Jenney's award of lump-sum alimony ($55,000.00) and the balance of the TBS account ($27,129.00), Jenney has a total of $82,129.00 in cash assets available to offset her monthly deficit incurred.

¶22. The $3,000.00 periodic monthly alimony award certainly attempted to meet a monthly expense deficit of Jenney. However, due to the unique facts of this case, the chancery court's award is excessive when considering that Jenney could substantially increase her monthly income by working more than part-time hours. This substantial increase in income would require no further training, college, or seeking additional employment. She would merely have to agree to work more hours at her present job. Further, Dan is entitled to a reasonable standard of living, just as Jenney is. Jenney is living in the marital home, and Dan is living in an apartment. Dan's living expenses, plus his child support obligation, lump-sum alimony obligations until 2021, and periodic monthly alimony of $3,000.00 per month produces a deficit each month which is impossible to permanently maintain. Further, that deficit would substantially adversely affect the "decent standard" of living to which he too is entitled when a court is considering the award of periodic alimony.

¶23. In *Tilley v. Tilley*, 610 So. 2d 348, 354 (Miss. 1994), the Mississippi Supreme Court addressed the issue of standard of living and availability of resources. The Court stated:

> Certainly Joyce and the children deserve to enjoy a nice standard of living with many amenities of life. But the blunt truth is that now two families will have to live on the same salaries that once supported one family. **There is no way the standard of living can remain as high as it once might have been.**

(Emphasis added). Jenney could increase her income substantially by merely working more

18

than part-time hours. Whether expenses could be reduced by Dan or Jenney was not really addressed at trial or by the trial court. Be that as it may, the chancery court's order and the obligations imposed would require Dan to spend more than he made each and every month. Dan's deficit in income would prevent him from being able to function and live with a "decent standard of living." Therefore, we find that the $3,000.00 in monthly periodic alimony the chancery court awarded was manifest error and that this case should be remanded for a reconsideration of the monthly periodic alimony and the amount thereof. This Court is not forestalling or precluding any future award of monthly periodic alimony on remand. Rather, this Court finds that the chancery court erred by not considering the "decent standard of living" to which Dan was entitled or the fact that Dan had a monthly deficit each month after paying the amount of monthly periodic alimony ordered.

### D. Application of *Armstrong* Factors

¶24. Dan asserts that the chancery court failed to consider and weigh relevant facts in its *Armstrong* factor analysis, which constitutes manifest error and abuse of discretion on behalf of the court in awarding Jenney periodic alimony. *Armstrong*, 618 So. 2d at 1278. In *Armstrong*, the Supreme Court set out certain factors to be considered when analyzing the appropriateness of alimony including: "(1) The income and expenses of the parties; (2) The health and earning capacities of the parties; (3) The needs of each party; (4) The obligations and assets of each party; (5) The length of the marriage; (6) The presence or absence of minor children in the home, which may require that one or both of the parties either pay or personally provide, child care; (7) The age of the parties; (8) The standard of living of the

19

parties, both during the marriage and at the time of the support determination; (9) The tax consequences of the spousal support order; (10) Fault or misconduct; (11) Wasteful dissipation of assets by either party; or (12) Any other factor deemed by the court to be 'just and equitable' in connection with the setting of spousal support." *Id*. at 1280. Specifically, Dan alleges that the court failed to consider Jenney's use of the parties' joint savings and joint checking accounts, Jenney's assets (both marital and non-marital), his financial obligations, and the lack of liquid assets.

¶25. After the separation, Jenney withdrew $49,500.00 from the parties' joint savings account and $5,000.00 from their joint checking account, for a total withdrawal of $54,500.00 without Dan's knowledge or consent. Jenney testified that she spent some of the money on monthly needs and the payment of attorney's fees. The court noted that Jenney spent roughly $27,370.46 between the time of withdrawal and the temporary hearing on March 28, 2017. The balance of the withdrawal in the amount of $27,129.54 was deposited into the registry of the court. The chancery court stated in its memorandum opinion, "These circumstances were considered by the Court during the hearing conducted on March 28, 2017." Although the chancery court did acknowledge Jenney's withdrawal of funds from the parties' joint accounts and gave a compete recitation of the history of those accounts in its memorandum opinion, including how the accounts were dealt with in the temporary order, it did not find that the withdrawal of funds constituted a dissipation of assets to be considered in an *Armstrong* analysis. Finding no error with the chancery court's treatment of Jenney's withdrawal of funds from the parties' joint accounts, we affirm as to this issue.

20

¶26. All other issues Dan raises concerning the chancery court's *Armstrong* analysis have already been addressed in this opinion.

### E. Classification of the MSTC Account

¶27. Dan asserts that the MSTC account was incorrectly classified as property belonging to Jenney's father, rather than a non-marital asset to be awarded to Jenney, or at the very least, an additional monetary resource available to Jenney to be considered in an *Armstrong* analysis. *Id*. at 1278. *Armstrong* requires the chancellor to consider the parties' obligations and **assets**. *Id.* at 1280 (emphasis added). In *Carpenter v. Carpenter*, 519 So. 2d 891, 892-93 (Miss. 1988), the Supreme Court considered Mrs. Carpenter's separate estate and more specifically her interest in a family trust in its alimony analysis. Dan testified at trial that he and Jenney had discussed the account and that she told him the funds were intended to be used or saved for "the boys." He asserts that although this account may not be a marital asset, in his conversations with Jenney and given their knowledge about the account, she had an interest in the account, and the chancery court should have considered it in the equitable-division analysis.

¶28. Jenney testified at trial that her father opened an MSTC account in 2002. The share ledger associated with the account was introduced as an exhibit at trial and showed both Jenney's name and her father's name on the account. Further, the ledger showed an available balance of $19,778.45. Three checks written for deposits into the account were also entered as a composite exhibit at trial. One check listed Jenney's name in the memo line along with the account number. Jenney testified that her father opened an account for herself and an

21

account for her brother. Jenney included the MSTC account on her Rule 8.05 financial statement in the section entitled checking/savings accounts, and the information that she provided was consistent with the information within the share ledger exhibit concerning the names on the account and the available balance. After considering Dan's and Jenney's testimony at trial regarding the MSTC account, the chancery court held that the account was not to be considered marital nor either parties' non-marital property but should instead be classified as property belonging to Jenney's father.

¶29. In *Harrell v. Harrell*, 231 So. 2d 793, 795 (Miss. 1970), the Supreme Court stated:

> We glean from the authorities that the determination of ownership of a joint bank account ordinarily reduced itself to a finding of intent. In Am. Jur. 2d Banks, Section 374 (1963), we note:
>
>> The prevailing view seems to be, however, that while joint accounts are presumed to be vested in the names as given in the deposit as equal contributors and owners in the absence of evidence to the contrary, the intention of the parties is the controlling factor, and where a controversy arises as to the ownership thereof evidence is admissible to show the true situation.

(Asterisks omitted). It was uncontradicted by the evidence presented at trial that Jenney's name was associated with the MSTC account. Further, it is clear that Jenney acknowledged some ownership of the account by listing it on her Rule 8.05 financial statement. Finally, it is clear that Jenney's father opened the account, "for her," that at least one check written for deposit into the account listed Jenney's name in the memo line, and that it was communicated between Dan and Jenney that the money was to be used or saved for their sons. Given the evidence, it is clear that Jenney's and her father's intent was that she have an interest in the

22

account. Therefore, we reverse and remand the chancery court's finding that the MSTC account was the sole property of Jenney's father. On remand, the chancery court should label the MSTC account a non-marital asset belonging and available to Jenney and give it what weight it deems relevant in considering the issue of monthly periodic alimony.

## II. Child Support

¶30. Although Dan agreed to pay child support, the issue of the amount of child support was one that was left for the chancery court to decide at trial. Dan asserts that the award of child support in the amount of $1,200.00 until May 2019 and then $1,800.00 beginning June 1, 2019, is inconsistent with statutory requirements. Dan asserts that his adjusted gross income exceeds $100,000.00 and that pursuant to Mississippi Code Annotated section 43-19-101 (Rev. 2015), the chancery court was required to make written findings as to whether the application of the child support guidelines are appropriate. He further asserts that the child support payments at both the $1,200.00 rate and the $1,800.00 rate exceeded the statutory guidelines when taking into consideration his payment of health insurance and the private school expenses for one year. The exhibits at trial reflect that Dan paid $502.00 for medical insurance, which is a family plan that includes coverage for both Dan and Jenney and their two minor children. The record does not reflect the cost of coverage for the individual children alone. Dan testified that the monthly expenses for private school were $1,091.00. Dan was ordered to pay monthly child support in the amount of $1,200.00 while the children were still attending private school, and he was required to bear the cost of the private school expenses. Beginning on June 1, 2019, when his obligation to pay the private school expenses

terminated, his monthly child support payment increased to $1,800.00. Both of the monthly child support figures, standing alone, fall below the twenty-percent threshold of the statutory child-support guidelines.

¶31. The child-support award guidelines are set forth in Mississippi Code Annotated sections 43-19-101 and 43-19-103 (Rev. 2015) and were attached to the chancery court's memorandum opinion. In *Brennan v. Brennan*, 638 So. 2d 1320, 1325 (Miss. 1994), the Supreme Court stated, "When the parties by agreement submitted for the court's consideration the issue of the payment of child support with the amount to be determined by the court, they submitted all economic issues pertaining to the subject of child support." (Internal quotation marks omitted). In *Chesney v. Chesney*, 849 So. 2d 860, 863 (¶15) (Miss. 2002), the Supreme Court upheld this Court's decision that additional costs such as private school tuition and athletic fees are in the nature of child support.

¶32. Here, the chancery court referenced *Chesney* in its ruling and discussed at length, the facts surrounding the child support award. The court addressed Dan's income, his payment of private school expenses (and what those expenses were), Dan's payment for health insurance and life insurance, and the monthly expenses that Jenney indicated she regularly incurred on behalf of the minor children (e.g., food and household supplies). Dan failed to provide the exact cost of health insurance coverage for the minor children but only provided the cost of family plan that includes coverage for Dan, Jenney, and the two minor children. Jenney listed the monthly expenses for the minor children on her Rule 8.05 financial statement, totaling $1,904.66, and the monthly child support award of $1,800.00 was

24

supported by the evidence as articulated by the chancery court. Finding no error in the ruling of the court, we affirm as to this issue.

### III. Visitation

¶33. Before trial, the parties stipulated that Jenney would have sole physical custody of the parties' minor children; however, Dan requested extra visitation over and above the visitation that was provided for in the parties' temporary agreement. In addition to visitation every first and third weekend, Dan requested visitation every fifth weekend. Further, Dan requested that he be allowed to pick up the children one day per week and return them to Jenney by 6:00 p.m. each time. Finally, Dan requested that he be allowed telephonic contact with the children every day. Dan testified at trial that he was very involved in the children's sports activities and day-to-day life and that he wanted as much time with them as the court would give him. Both Jenney and Dan testified to the communication difficulties that each had with the other concerning the children's schedules and activities. This Court has held:

> "On visitation issues, as with other issues concerning children, the chancery court enjoys a large amount of discretion in making its determination of what is in the best interest of the child." *Haddon v. Haddon*, 806 So. 2d 1017, 1021 (¶12) (Miss. 2000). "The specification of times for visitation rights is committed to the broad discretion of the chancellor." *Id*.

*Bolton v. Bolton*, 63 So. 3d 600, 607 (¶22) (Miss. Ct. App. 2011). The chancery court denied Dan's request to have visitation with the children **every** fifth weekend but awarded him visitation **every other** fifth weekend. The chancery court denied Dan's request for telephonic communication with the children every day but did award him telephonic contact with the minor children up to three times per week between the hours of 6:30 p.m. and

8:00 p.m. Finally, the chancery court denied Dan's request for weekday visitation with the children. The court's order clearly provided for liberal visitation. It alternated the fifth-weekend visitation between both parents so that both parents could be as involved as they wanted to be in their children's lives. The law provides the chancellor broad discretion as to the parameter of visitation to the non-custodial parent. Finding no error in the chancery court's ruling as to Dan's visitation with the minor children, we affirm this decision.

### IV.    Minor-Child Tax Deduction

¶34.    Both Jenney and Dan requested that they be authorized to claim the children as dependents on their federal and state income taxes. Dan asserts that as a result of the significant support obligations ordered by the chancery court, he should be allowed to claim both children as exemptions for tax purposes.

¶35.    In *Louk v. Louk*, 761 So. 2d 878, 884 (¶17) (Miss. 2000), the Supreme Court discussed multiple factors to be considered in determining which party should receive the tax exemption for the minor children, as follows:

> (1) the value of the exemption at the marginal tax rate of each parent; (2) the income of each parent; (3) the age of the child(ren) and how long the exemption will be available; (4) the percentage of the cost of supporting the child(ren) borne by each parent; and (5) the financial burden assumed by each parent under the property settlement in the case. *Glover v. Torrence*, 723 N.E.2d 924, 938 (Ind. Ct. App. 2000).

Here, the chancery court had multiple factors to consider rather than just the one factor that Dan asserted in his request for both tax exemptions. The chancery court stated in its memorandum opinion, "This court has considered the evidence relevant to the *Louk* factors and this court finds that each parent should be authorized to claim a child as a dependant."

The court specifically references its consideration of both Dan and Jenney's 2017 income tax returns and the benefit to each by claiming the children as dependents. In this case, the chancery court's decision to award each party the authorization to claim one child as a dependent does not appear to be an abuse of discretion. Therefore, this issue is without merit.

## V. Final Authority to Make Final Health, Education, and Welfare Decisions for the Minor Children.

¶36. Dan and Jenney both requested that they be awarded the final authority to make health, education, and welfare decisions for the minor children. Dan argues that there were two situations where the parties had already disagreed as to children's health and education. More specifically, the parties disagreed as to whether the children would remain in private school or attend public school and the parties' views on particular medications that the children should be allowed to take. The chancery court noted both of these scenarios in its memorandum opinion:

> "Mississippi statutory law and jurisprudence recognize that the chancellor may indeed allocate decision-making and duties to each parent sharing joint legal custody." *Carpenter v. Lyles*, 120 So. 3d 1031, 1037 (¶22) (Miss. Ct. App. 2013) (citing *Goudelock v. Goudelock*, 104 So. 3d 158,165 (¶¶29-30) (Miss. Ct. App. 2012); *Purviance v. Burgess*, 980 So. 2d 308, 312-313 (¶¶18-20) (Miss. Ct. App. 2007)). "In cases where decision[-]making was apportioned, courts have determined that joint legal custody, including the communication required in support of such relationship, requires no moment-to-moment input or veto power over every large and small decision on child rearing . . . ." *Id*. Mississippi caselaw also recognizes that "the custodial parent may determine the child's upbringing, including his education and health and dental care. Such discretion is inherent in custody. It is vested in the custodial [parent.]" *Clements v. Young*, 481So. 2d 263, 267 (Miss. 1985); *See also Ayers v. Ayers*, 734 So. 2d 213, 217 (¶20) (Miss. Ct. App. 1999).

*Taylor v. Timmons*, 228 So. 3d 311, 316 (¶9) (Miss. Ct. App. 2017). Here, the chancery court considered Jenney as the parent who had more frequent care of the children. Further, since Jenney had physical custody of the children, the court found that Jenney should be granted the authority to make the final decisions regarding the minor children's health, education, and welfare. Finding no error in the chancery court's ruling, we affirm as to this issue.

## CONCLUSION

¶37. After a two-day trial on September 17 and 18, 2018, the chancery court held that Jenney should be awarded $1,200.00 per month in child support beginning November 1, 2018, and $1,800 beginning June 1, 2019, after Dan's obligation to pay private school tuition terminated. We affirm this judgment. Further, the chancery court denied Dan's request for weekday visitation with the minor children but awarded him visitation every other fifth weekend, and up to three telephonic visitations per week. We affirm this judgment. The chancery court granted Jenney the final decision-making authority for all health and education decisions concerning the minor children and awarded both Dan and Jenney the authority to claim one of the minor children as a dependent for tax purposes. We affirm this judgment. In its division of marital assets and alimony consideration, the chancery court set the date of demarcation for asset valuation purposes as the date of the trial. We find this was within the discretion of the chancellor and affirm. The court awarded Jenney the balance of the TBS account, awarded Dan the value of his Valic account and found that MSTC account was a non-marital asset that was neither Dan or Jenney's property but rather the property of

28

Jenney's father. We affirm this judgment in part; however, reverse and remand as to the classification of the MSTC account. Finally, the court awarded Jenney lump sum alimony in the amount of $55,000.00 to be paid in five installments of $11,000.00 beginning May 1, 2019 and monthly periodic alimony in the amount of $3,000.00 per month. While the chancery court came to the lump-sum alimony figure with some miscalculations as to the value of marital and non-marital assets, we affirm the judgment as to lump-sum alimony. We reverse and remand the issue of periodic alimony and the amount thereof for proceedings consistent with this opinion.

¶38. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**GREENLEE, WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY J. WILSON, P.J.; CARLTON, P.J., JOINS IN PART.**

**BARNES, C.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶39. I respectfully dissent from the majority's decision to reverse and remand the chancellor's award of monthly periodic alimony to Jenney in the amount of $3,000 per month. Instead, I would affirm the periodic alimony award. I concur with the majority on the remaining issues.

¶40. Our well-established standard of review provides that a chancellor has broad discretion in determining alimony awards, and "his discretion will not be reversed on appeal unless the chancellor was manifestly in error in his finding of fact and abused his discretion." *Coggins v. Coggins*, 132 So. 3d 636, 640 (¶8) (Miss. Ct. App. 2014) (quoting *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993)). The majority determines, in spite of our

limited standard of review, that this Court should substitute its opinion for the chancellor's and remand the case for the chancellor to re-determine a lower award of periodic alimony for Jenney. I cannot agree. The chancellor's award of $3,000 per month was not an abuse of discretion.

¶41. The supreme court has long held that

> alimony . . . should be reasonable in amount, commensurate with the wife's accustomed standard of living, minus her own resources, and considering the ability of the husband to pay. So long as [the chancellor] is mindful and respectful of this general standard, we consider that the amount of an alimony award is a matter largely within the discretion of the chancery court because of its peculiar opportunity to sense the equities of the situation before it.

*Wood v. Wood*, 495 So. 2d 503, 506 (Miss. 1986). "[T]he chancellor should consider the reasonable needs of the wife and the right of the husband to lead as normal a life as possible with a decent standard of living." *Tilley v. Tilley*, 610 So. 2d 348, 354 (Miss. 1992).

¶42. Here, the chancellor made the relevant alimony analysis under the *Armstrong* factors: the parties' fourteen-year marriage; both individuals being gainfully employed but Dan having more earning potential than Jenney after certification as a nurse anesthetist; Jenney working limited hours after the children were born; the parties' high standard of living; their sending their children to private school; and the parties' expenses, among other matters. The majority disagrees with the chancellor's findings, claiming Dan's "right to a 'decent standard' of living" would be impinged upon by the $3,000 alimony award, creating an expense deficit each month that would be "impossible to permanently maintain." Therefore, the majority would vaguely require, as a matter of law, that Jenney work "more than part-time hours," as well as have full-time responsibility for the care of the parties' two children,

30

in order to reduce her expense deficit and thereby decrease Dan's income deficit. The majority further suggests that Jenney "merely . . . agree to work more hours at her present employment," reasoning that this would result in a substantial increase in income, requiring no further training or education on Jenney's part. I disagree, finding that the majority's suggestions take on too much of the chancery court's task in crafting an equitable solution to the parties' financial disparity.

¶43. The chancellor took into account all of the *Armstrong* factors in awarding Jenney this amount of alimony. Jenney put her career on hold in order to raise two children, although she works part-time. Jenney now has full-time custody of those children. Further, the record indicates Dan makes much more money than Jenney. Moreover, the chancellor found Dan committed "marital misconduct" (an affair), confirmation of which through a private investigator was the reason Jenney divorced Dan. The chancellor stated the affair "was the terminating factor in the stability and harmony of the marital relationship and [was] a significant interruption in the family relationships." Adultery was ultimately not the ground for the parties's irreconcilable-differences divorce. However, while alimony should not be awarded as a punishment, fault or misconduct has always been a factor to consider in determining periodic alimony under *Armstrong*. *George v. George*, 22 So. 3d 424, 429 (¶9) (Miss. Ct. App. 2009) (citing *Lauro v. Lauro*, 847 So. 2d 843, 850 (¶17) (Miss. Ct. App. 2003)). All of these findings were considered by the chancellor in making his decision on the amount of Jenney's alimony award, which is not excessive. For these reasons, I find the periodic alimony award of $3,000 per month was not manifest error.

¶44. Accordingly, I dissent regarding the issue of alimony.

**J. WILSON, P.J., JOINS THIS OPINION. CARLTON, P.J., JOINS THIS OPINION IN PART.**